# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

OZCAN DALGIC,

    Plaintiff,

        v.

MISERICORDIA UNIVERSITY,

    Defendant.

NO. 3:16-CV-0443

(JUDGE CAPUTO)

## MEMORANDUM

Presently before me are cross-motions for summary judgment filed by Plaintiff Ozcan Dalgic ("Dalgic") (Doc. 50) and Defendant Misericordia University ("Misericordia") (Doc. 53). Dalgic attended and graduated from Misericordia's Doctor of Physical Therapy Degree Program in December 2013 while on an F-1 visa. As authorized by federal law, Dalgic sought to remain in the United States thereafter for post-completion Optional Practical Training ("OPT"), the application and approval process for which is set forth in 8 C.F.R. § 214.2(f)(11). In order to apply for OPT, the student must first have a recommendation from his or her university's Designated School Official ("DSO"). Pursuant to the regulations, a student must submit his or her OPT application within 30 days of the date the DSO enters the OPT recommendation into the Student and Exchange Visitor Information System ("SEVIS"). However, the student cannot submit the application until 90 days before his or her graduation date. In other words, the earliest the DSO can submit the OPT recommendation is 120 days before the student's graduation.

Dalgic's OPT application was denied in March 2014, which Dalgic claims was caused by the negligence of Misericordia's DSO prematurely submitting the OPT recommendation in July 2013, *i.e.*, more than 120 days before his graduation. While Misericordia admits that it prematurely recommended Dalgic for OPT in July 2013, it contends that subsequent events that took place in December 2013 establish that

Dalgic's own conduct caused the denial of his OPT application. Because the admissible record evidence demonstrates that there is no genuine issue of fact that Misericordia's negligence caused the denial of Dalgic's application to participate in OPT and he is entitled to judgment as a matter of law, Misericordia's motion for summary judgment will be denied and Dalgic's cross-motion for summary judgment as to liability will be granted.

## I. Background

The facts are derived from the parties' factual statements, (*see* Doc. 51, Plaintiff's Statement of Material Facts, "Pl.'s SMF"; Doc. 54, Defendant's Statement of Material Facts, "Def.'s SMF"), their responsive factual statements, (*see* Doc. 59, Plaintiff's Counterstatement of Facts, "Pl.'s CSF"; Doc. 61, Defendant's Counterstatement of Facts, "Def.'s CSF"), and the relevant, admissible documents and testimony of record.[1]

Dalgic was born in Turkey in 1980. (*See* Def.'s SMF, ¶¶ 1-2; Pl.'s CSF, ¶¶ 1-2). Dalgic came to the United States in 2005 on an F-1 visa. (*See* Def.'s SMF, ¶ 3; Pl.'s CSF, ¶ 3). Upon entering the United States, Dalgic attended several educational institutions where he studied biology and English. (*See* Pl.'s SMF, ¶ 2; Def.'s CSF, ¶ 2).

By 2011, Dalgic was in the position to pursue his goal of obtaining a physical therapy degree, so he enrolled in Misericordia's Doctor of Physical Therapy Degree

---

[1] Local Rule 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. Pa. L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issue for trial. *See id*. Denying a fact on the ground that it is based on "a writing which speaks for itself" is not a proper denial under Local Rule 56.1. *See Computer Support, Inc. v. Booker Transp. Servs., Inc.*, No. 08-608, 2009 WL 2957744, at *2 n.3 (M.D. Pa. Sept. 9, 2009). Facts denied on this ground are thus deemed admitted.

Program with an anticipated graduation date in December 2013. (*See* Pl.'s SMF, ¶¶ 3-4; Def.'s CSF, ¶¶ 3-4). Misericordia was a certified member of the Student and Exchange Visitor Program ("SEVP"). (*See* Pl.'s SMF, ¶ 5; Def.'s CSF, ¶ 5).

Students graduating from SEVP institutions may be authorized to remain in the United States to participate in Optional Practical Training ("OPT"). *See* 8 C.F.R. 214.2(f)(10). The Code of Federal Regulations sets forth the "OPT application and approval process." *Id*. at § 214.2(f)(11). OPT can take place either before or after graduation. (*See* Dessoye Dep., 76:76:18-77:3).

As required by federal law, a SEVP-certified institution was required to employ a Designated School Official. (*See* Pl.'s SMF, ¶ 8; Def.'s CSF, ¶ 8). Misericordia employed Jane Dessoye ("Dessoye") as its DSO from 2003 through June 2016. (*See* Pl.'s SMF, ¶ 9; Def.'s CSF, ¶ 9).[2] A DSO's responsibilities include, *inter alia*, assisting students with applying for OPT, instructing students to submit the proper documentation for OPT, helping students with filling out important forms, and providing students with accurate information to maintain non-immigration student status. (*See* Dessoye Dep., 77:11-17, 79:5-19, 81:5-14, 83:10-16).

In July 2013, Dalgic and Dessoye had a meeting where they discussed Dalgic's graduation and his hope to participate in OPT thereafter. (*See* Dalgic Dep., 97:15-99:5). The parties do not dispute that Dessoye recommended Dalgic for OPT on July 24, 2013. (*See* Def.'s SMF, ¶ 7; Pl.'s CSF, ¶ 7). The parties do dispute, however, whether Dalgic requested Dessoye complete the recommendation at that time. (*See id*.). Either way, it is undisputed that this recommendation was submitted prematurely and prior to the time permitted by the applicable regulations. (*See* Pl.'s SMF, ¶ 22; Def.'s CSF, ¶ 22; *see also* Doc. 66, 8 (Misericordia characterizing the July 2013 recommendation as "premature")). Dessoye never cancelled her July 24, 2013

---

[2]      Dessoye was terminated by Misericordia in June 2016. (*See* Dessoye Dep., 16:15-17:5). She was never given a reason for her termination. (*See id*. at 16:15-17:5, 152:14-156:18).

recommendation. (*See* Pl.'s SMF, ¶ 14; Def.'s CSF, ¶ 14).

On December 4, 2013, Dessoye reprinted Dalgic's Form I-20. (*See* Def.'s SMF, ¶ 20; Pl.'s CSF, ¶ 20).[3] The parties dispute the significance of that action. (*See* Def.'s SMF, ¶ 19; Pl.'s CSF, ¶ 19).[4]

Dalgic spoke with Dessoye about OPT again in December 2013. (*See* Def.'s SMF, ¶ 9; Pl.'s CSF, ¶ 9). Dessoye provided Dalgic with an OPT application packet. (*See* Def.'s SMF, ¶ 11; Pl.'s CMF, ¶ 11). According to Dalgic, the instructions in one of the documents provided by Dessoye were outdated and incorrectly indicated that the OPT application fee was $340.00. (*See* Dalgic Dep., 125:17-23). Dessoye, however, testified that it was "implausible" that she would have provided a copy of "incorrect instructions." (Dessoye Dep., 151:7-13). Dalgic did not confirm the correct fee prior to submitting his OPT application, stating that the instructions were provided by his advisor and he "100 percent trusted her." (Dalgic Dep., 128:16-130:9).

Dessoye assisted Dalgic with completing his OPT application, *i.e.*, the Form I-765, "Application for Employment Authorization." (Dalgic Dep., 112:7-18; *see also* Dessoye Dep., 77:8-10).[5] After the application was completed, Dalgic submitted his signed Form I-765 directly to United States Citizenship and Immigration Services ("USCIS"). (*See* Def.'s SMF, ¶¶ 22, 31; Pl.'s CSF, ¶¶ 22, 31).

USCIS received Dalgic's application on December 18, 2013. (*See* Def.'s SMF, ¶ 32; Pl.'s CSF, ¶ 32). USCIS returned Dalgic's application packet to him with a Form I-797C dated December 20, 2013 because "[t]he check amount is incorrect, or has not been provided." (Def.'s SMF, ¶ 33; Pl.'s CSF, ¶ 33). Dalgic received this

---

[3]   The Form I-20 is a "Certificate of Eligibility for Nonimmigrant Student Status." *See* https://studyinthestates.dhs.gov/sites/default/files/I-20_Active.pdf (last visited April 3, 2019).

[4]   That dispute is addressed at length below. *See infra* Part III.

[5]   Dalgic's OPT application and Form I-765 are referred to interchangeably in this Opinion.

4

notice prior to Christmas of 2013. (*See* Def.'s SMF, ¶ 35; Pl.'s CSF, ¶ 35).

Immediately after receiving that notice from USCIS, Dalgic called Dessoye to inform her that he received a letter saying the incorrect filing fee was submitted. (*See* Def.'s SMF, ¶ 36; Pl.'s CSF, ¶ 36). According to Dalgic, after he received that notice, Dessoye apologized for providing him with the incorrect filing fee amount, before providing him with the correct fee, *i.e.*, $380.00. (*See* Dalgic Dep., 122:7-13, 220:11-22). Dalgic subsequently "double check[ed]" this amount online. (*Id*. at 122:18-123:9).

On January 7, 2014, Dalgic resubmitted his OPT application with the proper filing fee. (*See* Def.'s SMF, ¶ 39; Pl.'s CSF, ¶ 39). Dalgic received notice that his application with the proper filing fee was received by USCIS on January 9, 2014. (*See* Def.'s SMF, ¶ 40; Pl.'s CSF, ¶ 40).

Dalgic received a letter from USCIS dated March 18, 2014 informing him that his OPT application was denied. (*See* Def.'s SMF, ¶ 41; Pl.'s CSF, ¶ 41). That letter stated, in pertinent part:

> The record shows that you filed your Form I-765 on January 09, 2014. You must file the Form I-765 with USCIS within 30 days of the date the Designated School Official (DSO) entered the recommendation for OPT into your SEVIS record. You applied for OPT on July 24, 2013. At the time of filing your Form I-765, more than 30 days had elapsed since your DSO entered the recommendation for OPT into your SEVIS record.
>
> Therefore, your application for employment authorization is denied.

(Pl.'s SMF, Ex. "4"). The denial letter also informed Dalgic that if he disagreed with the decision or had additional evidence to submit, he could file a motion to reopen or a motion to reconsider. (*See id*.). Dalgic was advised that a motion to reopen "must state the new facts to be considered and must be supported by affidavits or other new documentary evidence," while a motion to reconsider required proof that "the decision was legally incorrect according to statute, regulation, and/or precedent decision." (*Id*.).

Upon receiving the denial letter, Dalgic immediately contacted Dessoye, who apologized and stated that she would see what she could do. (*See* Def.'s SMF, ¶¶ 42, 44; Pl.'s CSF, ¶¶ 42, 44).

On March 21, 2014, Dessoye sent a letter to USCIS stating:

> I am writing to confirm that, as the Designated School Official for Misericordia University, I mistakenly submitted an OPT request for the above-named student on 07/24/2013. The student was not even scheduled to complete degree requirements until 12/18/2013. As such, the OPT request should not have been submitted at that point in time. On 01/22/2014, a second OPT request was submitted. On 03/18/2014, it was denied because the I-765 form was submitted more than 30 days after submission of the July 2013 OPT request.
>
> Given the above, I am writing in support of the student's request to reopen or reconsider the decision. The original OPT submission was entirely an error on my part, an error for which I apologize. I respectfully request that the student be held harmless for this mistake and that his OPT request be approved.

(Pl.'s SMF, Ex. "3").

Dalgic met with Dessoye in April 2014. (*See* Def.'s SMF, ¶ 45; Pl.'s CSF, ¶ 45). Dessoye filled out the appeal paperwork, and she sent it herself to USCIS. (*See* Dalgic Dep., 141:1-17).

On April 1, 2014, Dessoye sent a fax to USCIS including a copy of his motion to reopen or reconsider. (*See* Pl.'s SMF, Ex. 7"). Dessoye wrote on the cover letter of that fax that "[w]e are filing a motion to reopen and a motion to reconsider a decision that was made because of an error on my part." (*Id.*).

Dessoye sent an email to the Department of Homeland Security ("DHS") on April 25, 2014. (*See* Pl.'s SMF, Ex. "8"). In that email, Dessoye indicated:

> Due to human error, specifically my error, an OPT request submitted on behalf of the above-named student was denied. When the notice of denial was received on March 18, 2014 an appeal was immediately submitted. The student subsequently learned that it could take up to 6 months for the appeal to be acted upon. The student has since attempted to renew his driver's license but is unable to do so due to the fact that he is no longer in active status. So not only is the student unable to begin work in a position that he has been

offered as a doctor of physical therapy, but without the use of his vehicle, he is also struggling to do the basics, *e.g.*, grocery shop. He is in a very difficult situation because of my mistake. I am respectfully asking if anything can be done to expedite the review of his appeal form I-290B.

(*Id.*).

By letter dated July 15, 2014, USCIS denied Dalgic's motion for reconsideration of the denial of his Application for Employment Authorization. (*See* Pl.'s CSF, Ex. "D"). That letter explained:

Under Title 8 Code of Federal Regulations (8 CFR), section 103.5 a motion to reopen must state the new facts to be provided in the reopened proceeding and must be supported by affidavits or other documentary evidence. A motion to reconsider must also state the reasons for reconsideration and be supported by any pertinent precedent decisions to establish that the decision was based on an incorrect application of law or service policy.

Your motion does not provide new facts, nor does it give reasons for reconsideration. Your motion is dismissed per 8 CFR 103.5(a)(4).

(*Id.*).

In response to the denial letter, Dessoye sent a letter to USCIS dated July 21, 2014 that was virtually identical to her March 21, 2014 letter to USCIS. (*See* Pl.'s SMF, Ex. "10").

Dessoye also authored an email on July 21, 2014 to the Vermont Service Center, which Dessoye characterized as "kind of a troubleshooting arm or branch of USCIS." (Dessoye Dep., 137:15-138:13). Dessoye sent that email "[t]o the extent that [she] was not aware of what, if anything, Vermont could do for me, for us." (*Id.* at 139:3-5). In that email, sent to "vsc.schools@dhs.gov", Dessoye wrote:

I have just been notified by [Dalgic] that an appeal of a denial of an OPT request dated March 2014 has likewise been denied. This is the case despite the fact that documentation submitted with the appeal included a letter from me in which I accepted full responsibility for an error in timing that resulted in the original denial. I am stunned at the decision because the student was not at all at fault - it was completely my error. Is there any recourse?

Thank you for taking time to review this request. The

student is desperate!

(Pl.'s SMF, Ex. "9").

Dessoye received a response to her July 21, 2014 email on July 31, 2014 from an individual identified in the record only as Officer Wade of the "Vermont Service Center Customer Service Unit." (Def.'s SMF, Dessoye Affidavit, attachment).[6] The response provides:

> This is a response to the inquiry submitted on July 21, 2014, at 12:42 PM, relating to EACXX-XX-88701.
>
> Upon receipt of your inquiry, this file was requested and reviewed. A review of the file shows the following:
>
> This applicant filed the Application for Employment Authorization (Form I-765) with U.S. Citizenship and Immigration Services (USCIS) on January 9, 2014. The Form I-765 must be filed within 30 days of the Designated School Official's (DSO) entry of a recommendation for Optional Practical Training (OPT) in the applicant's Student and Exchange Visitor Information System (SEVIS) record.
>
> The record shows that the DSO recommendation for OPT was entered in the applicant's record on July 24, 2013. It is noted that you indicated the recommendation was made in error. The record also shows that a Certificate for Eligibility for Nonimmigrant (F-1) Student Status (SEVIS Form I-20) was reprinted on December 4, 2013, and submitted as supporting evidence with the applicant's Form I-765. The DSO recommendation for OPT was entered more than 30 days prior to the filing of the Form I-765. In addition, based on the SEVIS Form I-20 present in the filing materials, dated December 4, 2013, the intent to recommend this applicant for employment authorization based on OPT is noted. However, more than 30 days had elapsed from the reprinting of the Form I-20 and the filing date of the Form I-765.
>
> Also noted is your information stating that a second request for OPT was entered in this applicant's SEVIS record on January 22, 2014. This recommendation also does not meet the eligibility criteria for employment authorization based on OPT, as the DSO recommendation for OPT must be entered before the student applies with USCIS using the Form I-765.

---

[6] Dalgic challenges the admissibility of this email. (*See* Doc. 58, 10-15). The email is set forth herein only for background purposes. The substance of Dalgic's challenge to the admissibility of the July 31, 2014 email is addressed below in the text.

> A review of this file shows that the applicant filed the Form I-765 with USCIS more than 30 days following the DSO recommendation for OPT in the SEVIS record. In addition, any recommendation for OPT made following the filing of the Form I-765 does not meet the eligibility criteria found in Title 8 Code of Federal Regulations (8 CFR), section 214.2(f).
>
> The review of this file shows that the decision is correct; the application will not be re-opened on Service Motion.

(*Id.*).

As a result of the denial of his OPT application, Dalgic was unable to begin working at a job that he had secured as a doctor of physical therapy. (*See* Dessoye Dep., 158:3-22). Instead, Dalgic enrolled in a program for a master's degree in organizational management at Misericordia. (*See* Dalgic Dep., 58:3-7, 157:5-17).

While Dalgic was enrolled in that program, Fred Coop, the chair of Misericordia's business department, emailed Dessoye (and others) on January 8, 2015 inquiring whether it was Misericordia's "fault [Dalgic] does not have a work visa." (Pl.'s SMF, Ex. "2"). In answering that question, Dessoye explained that what neither she nor Dalgic "realized is that he needed to submit his application within 30 days of my submission of his recommendation. Because roughly 5 months had elapsed between the 2, immigration denied the request in March." (*Id.*). Dessoye went on to write that "[i]t all comes down to a debate as to whether or not it was Misericordia's (i.e., 'my') responsibility to know of and alert Ozcan to the timeline requirement for submission of his application. Ozcan obviously believes so." (*Id.*). Dessoye testified at her deposition she was not "falling on the sword" for Dalgic in her response to Coop. (Dessoye Dep., 141:4-20).

In the same email chain that Coop's question and Dessoye's response appear, Corina Staff, a business professor at Misericordia, asked if "the only reason for which [Dalgic's] visa was denied" was for the reason identified by Dessoye. (Pl.'s SMF, Ex. "2"). Dessoye responded that to her "knowledge that was the only reason that his visa was denied." (*Id.*).

Based on the foregoing, Dalgic commenced this action on March 11, 2016. (*See* Doc. 1, *generally*). Dalgic amended his pleading twice, and the operative pleading is the Second Amended Complaint. (*See* Doc. 24, *generally*). Therein, Dalgic alleges claims against Misericordia for negligence (Count I) and negligent interference with prospective contractual relations (Count II). (*See id*., *generally*). Misericordia answered the Second Amended Complaint on January 26, 2017. (*See* Doc. 25, *generally*). Misericordia subsequently filed for judgment on the pleadings. (*See* Doc. 26, *generally*). That motion was denied on September 29, 2017. (*See* Docs. 31-32, *generally*).

The parties proceeded to discovery, and at the conclusion thereof, the parties filed the instant cross-motions for summary judgment. (*See* Doc. 50, *generally*; Doc. 53, *generally*). Dalgic moves for partial summary judgment on the grounds that there exists no genuine issues of fact as to Misericordia's liability for its negligence. (*See* Doc. 52, *generally*). Misericordia, conversely, contends that it is entitled to summary judgment because Dalgic's own conduct was the proximate cause of the denial of his OPT application, no special relationship existed between Dalgic and Misericordia as required to sustain a negligent interference claim, and Dalgic's claims are barred by the statute of limitations. (*See* Doc. 55, *generally*). The cross-motions have now been fully briefed, so they are ripe for disposition.

## II. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A court may grant a motion for summary judgment if, after it considers all probative materials of record, with inferences drawn in favor of the non-moving party, the court is satisfied that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d 210, 218 (3d Cir. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S. Ct. 2548, 2556, 91 L. Ed. 2d 265 (1986);

*Brooks v. Kyler*, 204 F.3d 102, 105 n.5 (3d Cir. 2000)). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law. A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). "In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter . . . ." *American Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 587, 581 (3d Cir. 2009) (citing *Anderson*, 477 U.S. at 248-49, 106 S. Ct. 2505).

The moving party bears the initial burden to identify "specific portions of the record that establish the absence of a genuine issue of material fact." *Santini*, 795 F.3d at 416 (citing *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548, 2553). If this burden is satisfied by the movant, the burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)). The nonmovant's burden is not satisfied by "simply show[ing] that there is some metaphysical doubt as to the material facts." *Chavarriaga*, 806 F.3d at 218.

Where cross-motions for summary judgment are filed, the summary judgment standard remains the same. *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). When presented with cross motions for summary judgment, the Court must consider the motions separately, *see Williams v. Phila. Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994), and view the evidence presented for each motion in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

### III. Discussion

As stated, Dalgic has moved for partial summary judgment with respect to liability, while Misericordia seeks summary judgment in its entirety on Dalgic's

claims. The parties' cross-motions implicate, in large part, the federal regulations pertaining to the OPT application process. Thus, I begin with a discussion of the applicable regulations before proceeding to address the denial of Dalgic's OPT application and the parties' summary judgment motions.

## A.    8 C.F.R. § 214.2(f).[7]

Section 214.2(f) of Title 8 of the Code of Federal Regulations applies to students in "colleges, universities, seminaries, conservatories, academic high schools, elementary schools, other academic institutions, and in language training programs[.]" 8 C.F.R. § 214.2(f). Under that section,

> A nonimmigrant student may be admitted into the United States in nonimmigrant status under section 101(a)(15)(F) of the [Immigration and Nationality Act, 8 U.S.C. § 1101, *et seq*.], if:
>
> (A) The student presents a SEVIS Form I–20 issued in his or her own name by a school approved by the Service for attendance by F–1 foreign students. (In the alternative, for a student seeking admission prior to August 1, 2003, the student may present a currently-valid Form I–20A–B/I–20ID, if that form was issued by the school prior to January 30, 2003);
>
> (B) The student has documentary evidence of financial support in the amount indicated on the SEVIS Form I–20 (or the Form I–20A–B/I–20ID);
>
> (C) For students seeking initial admission only, the student intends to attend the school specified in the student's visa (or, where the student is exempt from the requirement for a visa, the school indicated on the SEVIS Form I–20 (or the Form I–20A–B/I–20ID)); and
>
> (D) In the case of a student who intends to study at a public secondary school, the student has demonstrated that he or she has reimbursed the local educational agency that administers the school for the full, unsubsidized per capita cost of providing education at the school for the period of the student's attendance.

*Id*. at § 214.2(f)(1).

---

[7]    Cited herein are the the federal regulations in effect from April 26, 2013 to April 28, 2015, *i.e.*, the dates relevant to the facts at issue.

Optional Practical Training is detailed in § 214.2(f)(10)(ii). The regulations provide that "[c]onsistent with the application and approval process in paragraph (f)(11) of this section, a student may apply to USCIS for authorization for temporary employment for optional practical training directly related to the student's major area of study." *Id*. at § 214.2(f)(10)(ii)(A). OPT may be granted "[a]fter completion of the course of study, or, for a student in a bachelor's, master's, or doctoral degree program, after completion of all course requirements for the degree (excluding thesis or equivalent). Continued enrollment, for the school's administrative purposes, after all requirements for the degree have been met does not preclude eligibility for optional practical training." *Id*.

The OPT application and approval process is described in § 214.2(f)(11).

(i) Student responsibilities. A student must initiate the OPT application process by requesting a recommendation for OPT from his or her DSO.[8] Upon making the recommendation, the DSO will provide the student a signed Form I–20 indicating that recommendation.

(A) Application for employment authorization. The student must properly file a Form I–765, Application for Employment Authorization, with USCIS, accompanied by the required fee for the Form I–765, and the supporting documents, as described in the form's instructions.

(B) Filing deadlines for pre-completion OPT and post-completion OPT.

. . . .

(2) For post-completion OPT, the student must properly file his or her Form I–765 up to 90 days prior to his or her program end-date and no later than 60 days after his or her program end-date. *The student must also file the Form I–765 with USCIS within 30 days of the date the DSO enters the recommendation for OPT into his or her SEVIS record.*

---

[8] DSO, *i.e.*, a "Designated School Official", is defined as "a regularly employed member of the school administration whose office is located at the school and whose compensation does not come from commissions for recruitment of foreign students." 8 C.F.R. § 214.3(l). This individual is appointed by "the president, owner, or head of a school or school system," and he or she "may not delegate this designation to any other person." *Id*.

. . . .

> (ii) DSO responsibilities. A student needs a recommendation from his or her DSO in order to apply for OPT. When a DSO recommends a student for OPT, the school assumes the added responsibility for maintaining the SEVIS record of that student for the entire period of authorized OPT, consistent with paragraph (f)(12) of this section.

> (A) Prior to making a recommendation, the DSO must ensure that the student is eligible for the given type and period of OPT and that the student is aware of his or her responsibilities for maintaining status while on OPT. Prior to recommending a 17–month OPT extension, the DSO must certify that the student's degree, as shown in SEVIS, is a bachelor's, master's, or doctorate degree with a degree code that is on the current STEM Designated Degree Program List.

> (B) The DSO must update the student's SEVIS record with the DSO's recommendation for OPT before the student can apply to USCIS for employment authorization. The DSO will indicate in SEVIS whether the employment is to be full-time or part-time, and note in SEVIS the start and end date of employment.

> (C) The DSO must provide the student with a signed, dated Form I–20 indicating that OPT has been recommended.

*Id*. at § 214.2(f)(11)(i)-(ii) (emphasis added).

Section 214(f)(11)(iii), "[d]ecision on application for OPT employment authorization," provides that an applicant for OPT "may not appeal the decision" by USCIS. *Id*. at § 214(f)(11)(iii).

With these regulations in mind, I turn to Dalgic's application for OPT and the denial of same.

**B.     Dalgic's OPT Application.**

By letter dated March 18, 2014, USCIS denied Dalgic's OPT application. (*See* Def.'s SMF, ¶ 41; Pl.'s CSF, ¶ 41). In so doing, USCIS explained that the Form I-765 must be filed within 30 days of the date the DSO "entered the recommendation for OPT into your SEVIS record." (Pl.'s SMF, Ex. "4"). According to USCIS, Dalgic "applied for OPT on July 24, 2013. At the time of filing [his] Form I-765 [on January 9, 2014], more than 30 days had elapsed since your DSO entered the recommendation

14

for OPT into your SEVIS record. Therefore, your application for employment authorization is denied." (*Id*.).

There is no dispute that Dessoye prematurely recommended Dalgic for OPT in July 2013. (*See* Def.'s SMF, ¶ 7; Pl.'s CSF, ¶ 7). Strict timelines, as quoted above, govern the post-completion OPT application process. *See* 8 C.F.R. § 214.2(f)(11)(i). Specifically, a student cannot apply for OPT until: (1) 90 days before his or her graduation date; and (2) the application must be submitted within 30 days of the date the DSO enters the student's OPT recommendation into his or her SEVIS record. *See id*. Thus, the earliest a DSO can enter a student's OPT recommendation date is 120 days before the student's graduation. Given that Dalgic's graduation was on December 13, 2013, (*see* Dalgic Dep., 115:2-3), these regulations meant that he could not apply for OPT until September 14, 2013, *i.e.*, 90 days before his graduation. However, Dalgic was also required to submit his application within 30 days of Dessoye's entry of his OPT recommendation into his SEVIS record on July 24, 2013, meaning that Dalgic was required to file his Form I-765 by August 23, 2013. As a result, Dalgic could not, consistent with the regulations, submit his application within 30 days of the entry of the OPT recommendation in his SEVIS record but no more than 90 days before his graduation date.

Misericordia argues, however, that Dessoye again recommended Dalgic for OPT on December 4, 2013 when she reprinted his Form I-20. While it is not contested that Dessoye reprinted the Form I-20 at that time, (*see* Def.'s SMF, ¶ 20; Pl.'s CSF, ¶ 20), the parties disagree as to the legal effect, if any, this had on Dalgic's OPT application. To Misericordia, this was either a new OPT recommendation or it "validated" Dessoye's prior recommendation, thereby restarting the 30 day period in which Dalgic had to submit his OPT application. As a result of Dalgic's subsequent failure to submit his Form I-765 until January 9, 2014, *i.e.*, more than 30 days after December 4, 2013, Misericordia is of the view that Dalgic was solely responsible for the denial of his application. To support its position that Dessoye's reprinting and signing of the

Form I-20 validated her premature recommendation from July 2013, Misericordia relies on the opinion of Attorney Cyrus D. Mehta and the July 31, 2014 email from Officer Wade. Dalgic challenges the admissibility of Mehta's report and Officer Wade's email.

### 1. The Mehta Report.

As support for its motion for summary judgment, Misericordia submitted an expert report authored by Cyrus D. Mehta, an attorney practicing immigration law for over twenty-five years. (*See* Def.'s SMF, Mehta Report). Mehta explains in his report that the "key consideration" in determining whether Misericordia caused the denial of Dalgic's OPT application is "whether the reprinting and signing of the Form I-20 with a December 4, 2013 issuance date rendered the July 23, 2013 recommendation timely for purposes of filing a timely I-765 application." (*See id*. at 6). Mehta concludes that the "recommendation of OPT on July 23, 2013, although premature, was not the proximate cause of the denial. Defendant reprinted and signed the I-20 on December 4, 2013, which revalidated the recommendation and thus allowed Plaintiff to file Form I-765 within 30 days." (*Id*. at 2). To reach this conclusion, Mehta looked to Officer Wade's July 31, 2014 email, noting that "Officer Wade viewed the controlling date for the 30-day filing period as December 4, 2013 and not July 23, 2013." (*Id*. at 7). This is "clear", says Mehta, "from the following line in Officer Wade's decision: . . . 'the intent to recommend this applicant for employment authorization based on OPT is noted. However, more than 30 days had elapsed from the reprinting of the Form I-20 and the filing date of the Form I-765.'" (*Id*.). Mehta reasons that "[i]f the reprinting of the I-20 was not a significant action, then there would have been no need for Officer Wade to make reference to the reprinting in the decision." (*Id*.). Mehta thus opines that Dalgic's OPT application was denied not because of Dessoye's premature recommendation in July 2013, but rather based on Dalgic's failure to file his Form I-765 within 30 days of December 4, 2013 when Dessoye reprinted and signed the Form I-20. (*See id*. at 10).

Mehta also authored a rebuttal report in response to the report issued by Lawrence Rudnick, (*see* Doc. 58, Ex. "2"), that was offered on behalf of Dalgic. (*See* Doc. 66, Ex. "A").  Therein, Mehta states that Officer Wade relied on his authority pursuant to 8 C.F.R. § 103.5(a)(5), which permits a USCIS officer, on his or her own accord, to reopen a proceeding or reconsider a decision. (*See id.* at 1-2).  Mehta goes on to opine that the phrase "enters the recommendation for OPT into his or her SEVIS record", as it appears in § 214.2(f)(11)(i), "can have varying interpretations" "[i]n the absence of a more precise and detailed definition." (*Id.* at 3).  Given this, Mehta surmises that Officer Wade determined that the reprinting of the Form I-20 "re-set the 30 day clock" as that is consistent with "Officer Wade recognizing that the reprinting of the I-20 demonstrated an 'intent to recommend this applicant for employment authorization based on OPT.'" (*Id.*).  Mehta concludes by finding that Dalgic's expert "obfuscates what was quite clearly stated in Officer Wade's decision," where Officer Wade "state[d] in no uncertain terms that the reason for the denial of the OPT was due to the I-765 application being filed more than 30 days from December 4, 2013." (*Id.*).

Dalgic challenged the admissibility of the report offered by Mehta, arguing that Misericordia was using Mehta merely as a "mouthpiece" to attempt to enter inadmissible evidence, *i.e.*, the Officer Wade email, into the summary judgment record. (*See* Doc. 58, 16-17 ("Misericordia's Expert Report Is Inadmissible"); Doc. 65, 11 ("Misericordia's expert report is likewise inadmissible . . .")).  Finding a legitimate question was presented as to whether Mehta's opinions satisfied the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), a *Daubert* hearing was conducted on May 31, 2019.  *See Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000) (a court is not required to conduct a *Daubert* hearing but can do so if significant reliability questions are raised by the expert's methodology, and if a *Daubert* hearing would permit a fuller assessment of expert's analytical processes).

At the May 31, 2019 *Daubert* hearing, Mehta explained that he was retained by Misericordia to review the record and determine the proximate cause of the denial of Dalgic's application for OPT. Mehta explained that his review of the record focused on the December 4, 2013 Form I-20 and Officer Wade's email. Mehta further testified that while he did not have Dalgic's SEVIS profile available to review when writing his report, he was provided a copy prior to testifying on May 31, 2019. The SEVIS profile or events history, said Mehta, is susceptible to errors and anomalies, it does not reflect the entire record of the case, and it is not unheard of for there to be inaccuracies on the event history. Mehta characterized the SEVIS profile or events history as different from a court docket. Thus, the most reliable record, Mehta explained, is a file that resides with USCIS.

According to Mehta, a recommendation for OPT is not a fixed event and the applicable rules do not provide the precise mechanics of what constitutes a recommendation for OPT. Mehta furthered offered his view that USCIS has room to interpret its own regulations. So in reviewing the sequence of events from the July 2013 recommendation to the December 2013 printing of the Form I-20, Mehta concluded that the I-765 application was denied because it was filed more than 30 days after December 4, 2013. In coming to that conclusion, Mehta indicated that while Officer Wade's email was helpful, he also looked at the applicable regulations in formulating his opinion. Mehta further testified on direct examination that the legal analysis he applied to the facts in this case is the same that he does in his day-to-day work as an immigration lawyer.

On cross-examination, Mehta testified that does not know whether Officer Wade was a USCIS employee or a contractor, but he assumed and surmised that Officer Wade was authorized to speak on behalf of USCIS. Mehta also indicated on cross-examination that he believed that Dessoye reprinted the Form I-20 in December 2013 by selecting updated, but he did not know that she did that for certain. Mehta additionally testified that even if Dessoye did not indicate updated when she printed

the Form I-20 at that time, it was part of her continuing recommendation that needed to be made with respect to Dalgic's OPT application. Mehta also indicated on cross-examination that it was accurate to characterize his report as an interpretation of Officer Wade's email and an opinion about its meaning.

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Under Rule 702, the trial judge serves as a "gatekeeper" to insure that expert testimony is both relevant and reliable. *See Daubert*, 509 U.S. at 589, 113 S. Ct. 2786.

"Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). With respect to reliability, the expert's testimony "'must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief.'" *Id*. (quoting *In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir. 1994)). In addition, "Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purpose of the case and must assist the trier of fact." *Id*.

Mehta's opinion fails to satisfy the requirements of Rule 702 and *Daubert*, so it will be excluded. Mehta's opinion is premised on (1) his interpretation of Officer

Wade's July 31, 2014 email, and (2) his understanding and interpretation of the regulations at issue in this case. (*See* Def.'s SMF, Mehta Report; *see also* Doc. 66, Ex. "A"). Neither is proper grounds for expert testimony.

For one, Officer Wade's email (if it were admissible) could be "easily read and comprehend[ed]" "without expert assistance." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 462 (S.D.N.Y. 2014). In that regard, an expert may not offer testimony that simply "regurgitates what a party has told him" or constructs "a factual narrative based on record evidence." *Id*. at 460. Thus, Mehta's opinion which seeks to explain a document that is readily understandable without the testimony of an expert is inadmissible. *See*, *e.g.*, *Dugas v. 3M Co.*, No. 14-1096, 2016 WL 7327666, at *3 (M.D. Fla. Mar. 30, 2016) (explaining expert testimony unnecessary where jury can read documents and reach own conclusions).

Misericordia and Mehta say as much. For instance, Misericordia's summary judgment submissions include the following statements about Officer Wade's email: (1) "[a] plain reading of the [Officer Wade] Opinion makes it clear that it was understood that the July 24, 2013 recommendation was an error," (Doc. 55, 7); (2) "the [Officer Wade] Opinion makes clear that Officer Wade viewed the controlling date for the beginning of the thirty (30) day filing period as December 4, 2013," (*id*. at 8); (3) "[t]he Expert Opinion confirms this plain meaning of the [Officer Wade] Opinion," (*id*.); and (4) "[t]he plain language of the [Officer Wade] Opinion, as further explained by Mr. Mehta, makes it clear that DALGIC'S failure to file his I-765 with the proper filing fee within thirty (30) days of December 4, 2018 was the proximate cause for the denial of his application . . . ." (*Id*. at 10-11). Mehta agrees with Misericordia on this score. (*See* Def.'s SMF, Mehta Report, 7 (stating December 4, 2013 as the controlling date for the 30 day filing period was "clear" from a "line in Officer Wade's decision"); *see also* Doc. 66, Ex. "A", 2 (Officer Wade's "reasoning in the decision clearly demonstrates that the December 4, 2013 date was considered for determining the 30-day filing period."), 3 (referring to "what was quite clearly stated in Officer Wade's

decision")). Given that Officer Wade's email can be plainly read and understood, as Misericordia and its expert agree, expert assistance is not required to comprehend its meaning.

Second, there does not appear to be any discernible methodology applied by Mehta in offering his opinion. Mehta simply explains what he believes Officer Wade meant in his email. While an expert can certainly testify to opinions based on hearsay, "[t]he expert may not, however, simply transmit that hearsay to the jury. Instead, the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (some of the expert's testimony ran afoul of Rule 703 because he had merely repeated information gathered from other sources without articulating how he applied his expertise to the underlying information being relayed); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 972 (D.C. Cir. 2016) ("The expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the proponent to 'circumvent the rules prohibiting hearsay.'").

Along that point, an expert may not be "used as a vehicle for circumventing the rules of evidence." *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (citation omitted). Rule 703 "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Id.* (citation and quotation omitted). In other words, Rule 703 "was never intended to allow oblique evasions of the hearsay rule." *Id.*; *see also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("Although the Rules permit experts some leeway with respect to hearsay evidence, Fed. R. Evid. 703, a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony."). That

would be precisely the outcome here, so Mehta's report and opinions are not admissible.

Mehta's testimony concerning his understanding of the applicable federal regulations is also not a subject for which expert testimony is proper. Indeed, "[t]he meaning of federal regulations is not a question of fact, to be resolved by the jury after a battle of experts. It is a question of law, to be resolved by the court." *Bammerlin v. Navistar Int'l Transp. Co.*, 30 F.3d 898, 900 (7th Cir. 1994) (citations omitted); *see also United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) ("The 'expert' would have testified about the meaning of the statute and regulations. That's a subject for the court, not for testimonial experts. The only legal expert in a federal courtroom is the judge."); *In re: Tylenol (Acetaminophen) Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 13-2436, 2016 WL 4538621, at *8 (E.D. Pa. Aug. 31, 2016) (interpretation of federal regulations is a "legal determination [that] is the job of the court, not an expert or the jury"); *Jones v. Midland Funding*, LLC, 616 F. Supp. 2d 224, 227 (D. Conn. 2009) ("An expert should not be permitted to express an opinion that is merely an interpretation of federal statutes or regulations, as that is the sole province of the court."); *accord Stissi v. Interstate & Ocean Transp. Co.*, 765 F.2d 370, 374 (2d Cir.1985) ("When a decision turns on the meaning of words in a statute or regulation, the decision is one of law which must be made by the court."). Thus, Mehta's opinion as to the meaning of 8 C.F.R. § 214.2(f)(11)(i) and his interpretation of the phrase "enters the recommendation for OPT into his or her service record" is not admissible. *See*, *e.g.*, *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 218 (3d Cir. 2006) ("testimony as to the legal effect of the various SEC pronouncements regarding Rule 144 and Regulation S, are inadmissible as improper legal opinions.").

Relatedly, Mehta's opinion improperly states "legal conclusions drawn by applying the law to the facts." *Highway Materials, Inc. v. Whitemarsh Twp.*, No. 02-3212, 2004 WL 2220974, at *20 (E.D. Pa. Oct. 4, 2004); *Pioneer Ctrs. Holding Co. ESOP & Trust v. Alerus Fin., N.A.*, 858 F.3d 1324, 1342 (10th Cir. 2017) ("expert may

not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." ); *United States v. McIver*, 470 F.3d 550, 561-62 (4th Cir. 2006) ("opinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible."). In particular, Mehta opines that Dessoye's premature OPT recommendation "was not the proximate cause" of his injuries. (*See* Def.'s SMF, Mehta Report, 2, 10). This is not proper expert testimony. *See, e.g., Dolfman v. Cedar Fair L.P.*, 648 F. App'x 285, 288 (3d Cir. 2016) ("an expert witness is prohibited from rendering a legal opinion. Proximate cause is a question of law for the court to answer."); *Flickinger v. Toys R US-Delaware, Inc.*, 492 F. App'x 217, 224 (3d Cir. 2012) ("substantial cause" is a "legal term[ ] of art that courts commonly hold cannot be the subject of expert testimony"); *Perez v. Townsend Eng'g Co.*, 562 F. Supp. 2d 647, 652 (M.D. Pa. 2007) (expert's "use of legal terms of art" is not appropriate); *see also Pioneer Ctrs.*, 858 F.3d at 1342 (testimony that makes "impermissible legal conclusions" may be excluded because it "does not aid the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's").

Finally, "[a]n expert opinion is not admissible if the court concludes that an opinion based upon particular facts cannot be grounded upon those facts." *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996) (citation omitted). "[I]f an expert opinion is based on speculation or conjecture, it may be stricken." *Id*. (citation omitted); *see also Elcock v. Kmart Corp.*, 233 F.3d 734, 755 & n.12 (3d Cir. 2000) (an expert may not testify to assumptions that are not "accompanied by a sufficient factual foundation," and "expert opinions not grounded in the facts of a case" are properly excluded).

In his report, Mehta states that the "reprinting of the I-20 requires an explanation in the SEVIS system before the DSO is allowed to print the document." (Def.'s SMF, Mehta Report, 7). After identifying the "Reprint Reason[s]" available in SEVIS, Mehta goes on to say: "[w]ithout entering a reason for the reprint, which in

this case would most likely have been under 'Updated,' a DSO would have not been allowed to move forward and reprint the I-20 since an option 'Reprint I-20' only appears on the page 'Reprint Reason Recorded', i.e., after the reprint reason has been recorded in Sevis." (*Id*.).

Mehta's statement that Dessoye printed the December 4, 2013 Form I-20 by choosing "Updated" as the "Reprint Reason" in is not tethered to any record facts. To begin, Mehta acknowledges in his report that his opinion on this point is entirely based on conjecture, *i.e.*, it is "most likely" that Dessoye entered "Updated" as the "Reprint Reason." (Def.'s SMF, Mehta Report, 7). When questioned about this statement at the *Daubert* hearing, Mr. Mehta testified that he surmised that this is what Dessoye did on December 4, 2013, and that he could not say with certainty that she in fact did so.

Further, at the May 31, 2019 hearing, entered into evidence for the first time in this case was a copy of Dalgic's SEVIS Event History. (*See* Pl.'s Hr'g Ex. "3").[9] The Event History does not reflect that a Form I-20 was "Reprinted" on December 4, 2013 as that term is used in SEVIS (or that any other activity occurred in Dalgic's record in December 2013). In comparison, the Event History shows an entry on February 7, 2015 that an "I-20 Reprinted" was "performed by" Dessoye. (*Id*.). This is consistent with a Form I-20 of the same date that reflects "Reprint reason: Updated" in section 3 of that form. (*See* Dessoye Dep., Ex. "6", MU0028).

During his testimony at the *Daubert* hearing, Mehta attempted to explain why the Event History would not reflect that the Form I-20 was "Reprinted" on December 4, 2013 even though Dessoye "most likely" selected "Reprint reason: Updated" in SEVIS. Mehta testified that the Event History is susceptible to errors and anomalies,

---

[9] The summary judgment record did not contain a copy of Dalgic's SEVIS record. Misericordia was directed to provide Dalgic a copy of that record in advance of the May 31, 2019 hearing. What it provided was entered into evidence at the hearing. (*See* Pl.'s Hr'g Ex. "3").

which has been reflected in official service documents. Mehta, though, did not identify the authority or documents he relied on to support that statement.

Mehta's testimony on this point is inadmissible. For one, it does not appear that Mehta is qualified to testify about how SEVIS operates and/or the purported errors or problems that exist with that system. In that regard, Mehta testified that: (1) he does not have access to Event Histories because he is not a DSO; (2) he has seen samples of Event Histories but he does not have any specific recollection of seeing one; (3) he never logged on to SEVIS before; (4) he has never printed a Form I-20; and (5) he never made a recommendation for OPT. Simply put, Mehta, an immigration lawyer, does not have the proper experience or knowledge to testify as to the mechanics and inner-workings of SEVIS. Moreover, the face of the Form I-20 shows that Mehta's opinion that Dessoye "Reprinted" the Form I-20 on December 4, 2013 after she "Updated" Dalgic's record is not grounded on the facts of the case. Turning to that Form I-20, section 3 states in full: "This certificate is issued to the student named above for: Continued attendance at this school." (Pl.'s Hr'g Ex. "13"). Unlike the February 7, 2015 Form I-20, the December 4, 2013 Form I-20 does *not* state "Reprint reason: Updated." (*Cf.* Pl.'s Hr'g Ex. "13", with Pl.'s Hr'g Ex. "8"). Mehta does not explain why this notation does not appear on the December 4, 2013 Form I-20 if Dessoye followed the steps that he says she "most likely" took. Simply put, Mehta's testimony concerning what Dessoye "most likely" did on December 4, 2013 is purely speculative and without foundation in the record.

The Affidavit signed by Dessoye and offered by Misericordia in support of its summary judgment motion does not offer an adequate factual foundation for Mehta's opinions. (*See* Def.'s SMF, Dessoye Aff.). To be sure, Dessoye stated that she was not the source of the Affidavit and that she did not make any substantive changes to its content after she received it from counsel. In that Affidavit, Dessoye states in pertinent part:

On December 4, 2013, Mr. Dalgic told me that I

25

> submitted the original employment authorization for OPT too early and asked me for another recommendation for employment authorization for OPT, so I went onto the SEVIS system to print the Form I-20 already on the system and checked the box "Updated" for the Form I-20.

(*Id*. at ¶ 4). To be certain, Mehta did not rely on Dessoye's Affidavit in preparing his report. (*See* Def.'s SMF, Mehta Report, *generally*). Nor could he, given that Dessoye's Affidavit is signed and dated January 11, 2019, which is *one day after* Mehta issued his report. (*Cf. id*., *with* Def.'s SMF, Dessoye Aff.). Mehta likewise did not testify at the *Daubert* hearing that he reviewed Dessoye's Affidavit.

Dessoye's Affidavit, at its core, is quite simply a "sham affidavit."

> A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant. . . . Therefore, if it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate.

*Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). "[S]tatements which conflict with an individual's deposition testimony do not raise a genuine issue of material fact and can properly be disregarded where the conflict is unexplained or unsupported by other record evidence." *Ray v. Pinnacle Health Hosp., Inc.*, 416 F. App'x 157, 164 n.8 (3d Cir.2010) (citing *Jiminez*, 503 F.3d at 253-54). "The timing of the affidavit, whether there is a plausible explanation for the contradictory statements, and whether there is independent evidence in the record supporting the affidavit, may be considered when determining whether an affidavit is a sham." *J.R. v. Lehigh Cnty.*, 534 F. App'x 104, 108 (3d Cir. 2013) (citing *EBC, Inc. v. Clark Bldg. Sys., Inc.* ., 618 F.3d 253, 268-69 (3d Cir. 2010)).

Because not all contradictory affidavits are necessarily shams, the Third Circuit has adopted a flexible approach for analyzing sham affidavits. *See Jiminez*, 503 F.3d

at 254 (citing *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004); *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir.1991); *Martin v. Merrell Dow Pharm., Inc.*, 851 F.2d 703, 705-706 (3d Cir. 1988)). When there is independent evidence in the record to corroborate an otherwise questionable affidavit, courts in the Third Circuit generally refuse to disregard the affidavit. *See id*. (citing *Baer*, 392 F.3d at 624–25). Such corroborating evidence may demonstrate that the affiant was understandably mistaken, confused, or without possession of all of the facts during the deposition. *See id*. (citing *Baer*, 392 F.3d at 624-25). Additionally, an affidavit will not be disregarded when the affiant offers a "satisfactory explanation" to explain the contradiction in his or her deposition testimony and the subsequent affidavit. *See id*. (citing *Hackman*, 932 F.2d at 241.) Where the affiant, however, fails to explain the contradiction between a subsequent affidavit and the prior deposition testimony, a trial court may disregard the affidavit as a sham. *See id*. (citing *Hackman*, 932 F.2d at 241).

Notably, a "sham affidavit" "need not directly contradict the earlier deposition testimony if there are other reasons to doubt its veracity, such as its inclusion of 'eleventh-hour revelations' that could have easily been discovered earlier." *Cellucci v. RBS Citizens, N.A.*, 987 F. Supp. 2d 578, 583 n.2 (E.D. Pa. 2013) (quoting *Jiminez*, 503 F.3d at 254-55).

Paragraph 4 of Dessoye's Affidavit does not directly conflict with her deposition testimony. (*See* Dessoye Dep., 104:1-21 (testifying that she had no independent recollection of recommending Dalgic for OPT in December 2013)). Nonetheless, Dessoye's statement that she checked the "Updated" box in SEVIS on December 4, 2013 is an "'eleventh-hour revelations' that could have easily been discovered earlier." *Cellucci*, 987 F. Supp. 2d at 583 (quoting *Jiminez*, 503 F.3d at 254-55). But, not only does Misericordia not explain this "eleventh-hour revelation," more problematic is that despite averring to having selected "Updated" in SEVIS on December 4, 2013, Dessoye testified at the May 31, 2019 hearing that she has no recollection of taking those steps in December 2013. She also testified that she was

not the source of the Affidavit and that it was written by counsel. Serious doubts are therefore present about the veracity of the contents of Paragraph 4 of the Dessoye Affidavit. Looking at the date the Affidavit was signed in the context of the content (and timing) of the Mehta report leads to the conclusion that the Affidavit was written in an attempt to provide factual support for the assumptions made by Misericordia's expert that lack record support. This approach fails for lack of credibility, and while there is no evidence that the Affidavit was submitted in bad faith or for purpose of delay, *see* Fed. R. Civ. P. 56(h), under the circumstances here *viz*., Dessoye's deposition and her testimony at the May 31, 2019 hearing, the Affidavit is simply not believable.[10]

Virtually all of Mehta's testimony whether factual or legal opinion was classic *ipse dixit*, *i..e.*, I say it is so, so it is so. His legal opinion had no legal authority and his factual opinions were simply just that. There was no methodology except to say that the way it was, was the way he said it was. At the core of the case is the question of whether there was a December 2013 recommendation from the DSO that would trigger the requirement that the Form I-765 would have to be filed by the student within 30 days. 8 C.F.R. § 214.2(f)(11)(i)(B)(2) states "the student must file his or her

---

[10]     Other paragraphs of Dessoye's Affidavit - while not bearing directly on the core issues discussed by Mehta - also contain impermissible sham testimony. For instance, Dessoye states in Paragraph 6 that Dalgic called her and said his OPT application was denied, (*see* Def.'s SMF, Dessoye Aff., ¶ 6), but during her deposition she testified that she could not recall whether Dalgic told her in person or on the phone that his application was denied. (*See* Dessoye Dep., 123:15-23). Likewise, Dessoye in Paragraph 2 of her Affidavit states that she "recommended Mr. Dalgic for employment authorization for [OPT] by completing a Form I-20 at his request." (Def.'s SMF, Dessoye Aff., ¶ 1). When she was deposed, however, Dessoye testified as to the steps for recommending a student for OPT, and once those steps are complete, then the Form I-20 can be printed. (*See* Dessoye Dep., 70:6-11, 71:12-73:5). Dessoye also made clear at her deposition that while the Form I-20 must be reprinted when a student applies for OPT, the Form I-20 is a document which shows that a student is legally in the United States and is not specific to the OPT application process. (*See id*. at 55:23-56:23, 67:12-69:3).

Form I-765 or successor form within thirty days of the date the DSO enters the recommendation for OPT into his or her SEVIS record." No recommendation was entered into Dalgic's SEVIS record in December 2013. Indeed, on April 1, 2019, I ordered the production of Dalgic's SEVIS record in advance of the hearing and it does not display a recommendation in December 2013. Mehta testified that the record produced purporting to be the SEVIS record was not the SEVIS record. Why? Because he said so. Mehta would have one believe that this entire process was whimsical. The requirements set forth in the Code of Federal Regulations were either meaningless or could be "interpreted" to mean the opposite of what they say. Moreover, Misericordia did not say that the produced document was not the record ordered to be produced until the May 31, 2019 hearing. I therefore take what was produced as the documents ordered, *i.e.*, the SEVIS record.

I have rarely seen testimony so tortured and so tailored to the need of the client when the evidence was plainly contrary to the position advanced in the testimony.

In sum, Mehta's testimony was and would be unhelpful to the fact finder. Moreover, the legal opinions were inappropriate. This is not foreign law which might require an expert. This is American law and to allow legal opinions, whether supported or not, as to what it is, would invite experts on patent law, tax law, trademark law, labor law, *etc.* to testify as to what the law is. This is not appropriate. If allowed, it would turn the judicial system upside down. This is the very province of a court; not an expert.

For these reasons, Mehta's testimony does not satisfy the requirements of the Federal Rules of Evidence or *Daubert*. It will not be considered in evaluating the parties' cross-motions for summary judgment.

### 2. Officer Wade's Email.

Officer Wade, as stated before, replied on July 31, 2014 to an email sent by Dessoye on July 21, 2014 to "vhs.schools@dhs.gov", wherein Dessoye was requesting if there was any "recourse" relating to the denial of Dalgic's OPT application where

"the student was not at all at fault" and it was "completely [her] error." (Pl.'s SMF, Ex. "9"). In his response, quoted in its entirety above, Officer Wade indicated that Dalgic's file "was requested and reviewed," and his "review of the file" showed, *inter alia*, that: (1) Dalgic's Form I-765 was filed with USCIS on January 9, 2014; (2) "the DSO recommendation for OPT was entered in the applicant's record on July 24, 2013"; (3) the Form I-20 was "reprinted on December 4, 2013, and submitted as supporting evidence with the applicant's Form I-765"; (4) the "DSO recommendation for OPT was entered more than 30 days prior to the filing of the Form I-765"; (5) "based on the SEVIS Form I-20 present in the filing materials, dated December 4, 2013, the intent to recommend this applicant for employment authorization based on OPT is noted. However, more than 30 days had elapsed from the reprinting of the Form I-20 and the filing date of the Form I-765"; (6) a "second request for OPT was entered in this applicant's SEVIS record on January 22, 2014"; and (7) "[a] review of this file shows that the applicant filed the Form I-765 with USCIS more than 30 days following the DSO recommendation for OPT in the SEVIS record." (Def.'s SMF, Dessoye Affidavit, attachment). Accordingly, Officer Wade concluded that "review of [Dalgic's] file shows that the decision is correct; this application will not be re-opened on Service Motion." (*Id.*).

Dalgic argues that this email cannot be considered here because it would not be admissible at trial for two reasons. (*See* Doc. 58, 10-15). First, Dalgic contends that there are considerable doubts about the authenticity of the email. (*See id.*). Second, Dalgic insists that the email is hearsay that does not fit within any of the exceptions to the hearsay rule. (*See id.*). Misericordia disputes that the email is inadmissible on authenticity and/or hearsay grounds. I agree with Dalgic that the Officer Wade email is inadmissible hearsay, so I do resolve whether Misericordia could properly

authenticate that document.[11]

Hearsay is a statement, other than the one made by the declarant while testifying at the trial, offered by a party into evidence to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Hearsay evidence is not admissible unless an exception applies pursuant to statute, the Federal Rules of Evidence, or other rules prescribed by the United States Supreme Court. *See* Fed. R. Evid. 802. Dalgic argues that Officer Wade's email is being offered for its truth, so it is a hearsay statement, (*see* Doc. 58, 13-15), and Misericordia does not contest this point. (*See* Doc. 66, 5-8). Misericordia instead claims that the email is admissible pursuant to either the public records exception to hearsay, *see* Fed. R. Evid. 803(8), or the residual exception, *see* Fed. R. Evid. 807.

The public records exception excludes the following from the rule against hearsay regardless of whether the declarant is available as a witness:

> A record or statement of a public office if:
>
> (A) It sets out:
>
> (i) The office's activities;
>
> (ii) A matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
>
> (iii) In a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
>
> (B) The opponent does not show that the source of

---

[11]     Federal Rule of Evidence 901(b) provides a non-exhaustive list of ways in which the authentication requirements of 901(a) can be met, and "[a] number of courts have . . . suggested the key factor in the Rule 901(b) list when it comes to email authentication is Rule 904(b)." *United States v. Bertram*, 259 F. Supp. 3d 638, 640 (E.D. Ky. 2017). That subsection explains that records may be authenticated by the introduction of testimony regarding their unique characteristics: *i.e.*, the "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4).

> information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8). "Public records have justifiably carried a presumption of reliability . . ." Fed. R. Evid. 803(8), 2014 Amendment Advisory Committee Notes. The party wishing to admit evidence under this exception simply needs to meet the definition of a "public record" under the Rule. *Id*. The burden then shifts to the opposing party to show that "the source of information or other circumstances indicate a lack of trustworthiness." *Id*.; Fed. R. Evid. 803(8). The Supreme Court has held that Rule 803(8) does not preclude the introduction of opinions and conclusions in public records provided: (1) the statements in the report are based on a factual investigation; and (2) the admitted portions of the report are trustworthy. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167, 109 S. Ct. 439, 102 L. Ed. 2d 445 (1988). As to the second of these requirements, the *Beech Aircraft* Court cited with approval four non-exhaustive factors for use when assessing whether an investigatory report is trustworthy under Rule 803(8): (1) the timeliness of the investigation; (2) the investigator's skill and experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation. *See Beech Aircraft*, 488 U.S. at 168 n.11, 109 S. Ct. 439. Interpreting *Beech Aircraft*, the Third Circuit has held that "public records are presumed admissible in the first instance and the party opposing the introduction bears the burden of coming forward with enough 'negative factors' to persuade a Court that the report should not be admitted." *Complaint of Nautilus Motor Tanker Co.*, Ltd., 85 F.3d 105, 112 (3d Cir.1996); *see also Clark v. Clabaugh*, 20 F.3d 1290, 1294-95 (3d Cir.1994) (holding that under Fed. R. Evid. 803(8), report by Pennsylvania State Police is "presumed admissible," "including its opinions, conclusions and recommendations, unless the defendants demonstrate its untrustworthiness.").

Officer Wade's July 31, 2014 email is not admissible as a public record pursuant to Rule 803(8). For one, in that email, Officer Wade makes clear that after receiving

Dessoye's July 21, 2014 email, he "requested and reviewed" Dalgic's file. (Def.'s SMF, Dessoye Affidavit, attachment). Officer Wade goes on to then summarize what the "review of the file show[ed] . . . ." *Id.* This does not meet the requirements for a public record because Officer Wade's email is based only on his review of Dalgic's file, "not h[is] own factual investigation, and Rule 803(8) 'bars the admission of statements not based on factual investigation.'" *English v. District of Columbia*, 651 F.3d 1, 8 (D.C. Cir. 2011) (quoting *Beech Aircraft*, 488 U.S. at 169, 109 S. Ct. 439) (finding letter inadmissible where the inspector only reviewed the investigative report and did not perform her own factual investigation); *see also Morro v. DGMB Casino, LLC*, 112 F. Supp. 3d 260, 274 (D.N.J. 2015) (OSHA letter did not satisfy the public records exception because it was not the product of a factual investigation); *accord In re Parmalata Secs. Litig.*, 477 F. Supp. 2d 637, 641 (S.D.N.Y. 2007) ("it cannot be that any investigation at all, no matter how one-sided or superficial, necessarily suffices" to meet the requirements under Rule 803(8)).

Second, insofar as Officer Wade purports to find that reprinting a Form I-20 "revalidates" a prior recommendation for OPT, as Misericordia says it does,[12] that determination is not admissible under Rule 803(8). *See, e.g.*, *Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770 (9th Cir. 2010); *Zeus Enters., Inc. v. Alphin Aircraft, Inc.*, 190 F.3d 238 (4th Cir. 1999); *Hines v. Brandon Steel Decks, Inc.*, 886 F.2d 299 (11th Cir. 1989) ("Legal conclusions are inadmissible because the jury would have no way of knowing whether the preparer of the report was cognizant of the requirements underlying the legal conclusion and, if not, whether the preparer might have a higher or lower standard than the law requires."); *accord Beech Aircraft*, 488 U.S. at 170 n.13, 109 S. Ct. 439 (expressing "no opinion on whether legal conclusions contained in an official report are admissible as 'findings of fact' under Rule 803(8)(C).").

---

[12]  As will be detailed in the text below, I do not agree with this reading of Officer Wade's email.

Indeed, "[p]ure legal conclusions are not admissible as factual findings" "for the obvious reason that a legal conclusion is not a factual statement." *Sullivan*, 623 F.3d at 777.

Officer Wade's email is also inadmissible since Dalgic has come forward with sufficient negative factors to persuade me that the email should not be admitted. Significantly, there is nothing in the record regarding Officer Wade's skill and experience. Indeed, other than his last name and that the signature line to his email indicates that he works at the Vermont Service Center in the Customer Service Unit, nothing at all is known about him.[13] It is unclear what position Officer Wade holds, how long he has held that position, and/or what his responsibilities are in that position. Officer Wade's familiarity with the governing regulations for OPT is likewise unknown. In short, Officer Wade's bona fides are a complete mystery. The untrustworthiness of the email is also reflected by the fact, as explained above, that Officer Wade conducted only a "review" of Dalgic's file, without an investigation or hearing. In these circumstances, Officer Wade's July 31, 2014 email does not meet the requirements for admissibility under the public records exception to hearsay. *See*, *e.g.*, *Sullivan*, 623 F.3d at 778 (affirming district court's exclusion of report under Rule 803(8) because, *inter alia*, "[t]he report is incomplete because its exhibits are not attached. Its author is unidentified and unknown, making it impossible to assess the author's skill or experience. No hearing was held."); *Morro*, 112 F. Supp. 3d at 274.

Nor is the email admissible under the residual exception to hearsay. Federal Rule of Evidence 807 provides:

> (a) In General. Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:

---

[13] Dessoye pointedly observed at the May 31, 2019 hearing that, although the parties (and I) have referred to Officer Wade as "he", we have no way to know from the record whether Officer Wade is male or female.

(1) the statement has equivalent circumstantial guarantees of trustworthiness;

(2) it is offered as evidence of a material fact;

(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

(4) admitting it will best serve the purposes of these rules and the interests of justice.

(b) Notice. The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

Fed. R. Evid. 807.[14] The Third Circuit has explained that the residual exception is "to be used only rarely, and in exceptional circumstances," and is meant to "apply only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." *United States v. Bailey*, 581 F.2d 341, 347 (3d Cir. 1978). For reasons explained above with respect to Rule 803(8), Officer Wade's July 31, 2014 email lacks trustworthiness. Similarly here, the email does not show that it has "equivalent circumstantial guarantees of trustworthiness" for it to be admitted under Rule 807. *See Ponzi v. Monroe Cty.*, No. 11-413, 2016 WL 4494173, at *4 (M.D. Pa. Aug. 24, 2016) (listing factors to consider when determining whether

---

[14]     There appears to be some disagreement as to whether Rule 807 should be utilized at summary judgment. *Compare Hughes v. SouthernCare, Inc.*, No. 12-388, 2014 WL 4843810, at *4 (N.D. Ind. Sept. 29, 2014) ("Rule 807, parts (a) and (b) together, contemplate the use of such statements only at an evidentiary hearing or trial, with pre-trial or pre-hearing notice to the opposing party. Thus Rule 807 is inapplicable to this summary judgment proceeding."), *with Estate of Hedayatzadeh by Hedayatzadeh v. Deutsche Lufthansa Aktiengesellschaft*, No. 16-2576, 2017 WL 6994571, at *6 (N.D. Ga. Nov. 30, 2017) ("the court finds that the statement qualifies for admission under Evidence Rule 807 such that it may be considered at summary judgment.").

35

proffered evidence has "equivalent circumstantial guarantees of trustworthiness").[15] These factors do not support a finding of admissibility because, among other reasons, the statement was not made under oath, the statement was not videotaped, the adverse party is unable to cross-examine the declarant, and the statement lacks corroboration. *See id*. Thus, the July 31, 2014 email from Officer Wade is not admissible under the residual exception to hearsay.

Finally, Misericordia argues that the email should be considered here at summary judgment because Officer Wade could be subpoenaed for trial.

> "The rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are capable of being admissible at trial." In ruling on a motion for summary judgment, the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial. The proponent need only "explain the admissible form that is anticipated."

*Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (internal alteration omitted).

The parties agree that prior to securing any testimony from Officer Wade, Misericordia would need to comply with 6 C.F.R. §§ 5.41-5.45. *See also United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 71 S. Ct. 416, 95 L. Ed. 417 (1951); *SEPTA v. Orrstown Fin. Servs., Inc.*, 367 F. Supp. 3d 267, 280-81 (M.D. Pa. 2019) ("The purpose of *Touhy* regulations is to conserve governmental resources where the United States is not a party to a suit, and to minimize governmental involvement in

---

[15] These factors are: (1) whether the declarant was under oath when the statement was made; (2) whether the declarant voluntarily made the statement; (3) whether the statement was based on the declarant's personal knowledge; (4) whether the statement contradicted a prior statement; (5) whether the statement was videotaped in order to provide the jury with an opportunity to evaluate the declarant's demeanor; (6) the ability of an adverse party to cross-examine the declarant; (7) the proximity in time between the statement and the events described; (8) whether the statement is corroborated; (9) the declarant's motivation to fabricate the contents of the statement; (10) whether the statement was prepared in anticipation of litigation; (11) the statement's spontaneity; and (12) whether the declarant's memory or perception was faulty. *Ponzini*, 2016 WL 4494173, at *4.

controversial matters unrelated to official business."). Misericordia concedes that it has not submitted a *Touhy* request, but notes that while that process "is difficult," it is not "impossible." (Doc. 66, 5 n.5).

Misericordia has failed to show it "can produce admissible evidence regarding a disputed issue of material fact at trial." *Fraternal Order of Police*, 842 F.3d at 238. For one, Misericordia has not submitted a request for Officer Wade to testify in the matter *sub judice*. Thus, at present, it would be pure speculation to conclude that Misericordia can comply with the applicable federal regulations to secure Officer Wade's trial testimony.

Second, even if Misericordia did comply with *Touhy*, a second, independent reason exists for finding that Misericordia has not demonstrated that it is able to secure admissible evidence regarding a disputed factual issue. In particular, Misericordia seeks to present Officer Wade's testimony to show that Dessoye's printing of the Form I-20 in December 2013 restarted the 30 day window for Dalgic to submit his OPT application. Of import, Misericordia does not explain how such testimony on this issue would be admissible. Whether the reprinting of a Form I-20 satisfies § 214.2(f)(11)(i)(B)(2) and meets its requirement that the OPT recommendation be entered into the SEVIS profile is a legal determination that is not a proper subject for lay opinion testimony. *See, e.g.*, *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 669 (10th Cir. 2006) (holding that a lay witness could not opine about whether something constituted a compelling state interest because it required legal expertise); *Christiansen v. National Savings and Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) ("lay legal conclusions are inadmissible in evidence"); *see also Langbord v. United States Dep't of Treasury*, No. 06-5315, 2011 WL 2623315, at *11 (E.D. Pa. July 5, 2011) ("Generally, neither an expert witness nor a lay person may give testimony that amounts to a legal conclusion.").

Officer Wade's email is inadmissible hearsay, and Misericorida has not show that it can present Officer Wade's opinion in an admissible form at trial. The email

is not properly considered in evaluating the parties' summary judgment motions.[16]

### 3. The OPT Recommendation.

Turning back to the regulations at issue and Dalgic's application for OPT, the evidence of record confirms that Dalgic was first (and prematurely) recommended for OPT in July 2013. This fact is not contested. There is also no dispute that a Form I-20 can be printed for purposes other than recommending a student for OPT. (*See* Dessoye Dep., 56:12-23). Dessoye confirmed this fact during her deposition, and more than one of Dalgic's Form I-20s without a recommendation for OPT appear in the summary judgment record. (*See* Dessoye Dep., 67:12-69:3; *see also id.* at Ex. "6"). Likewise, Dessoye testified that the steps for printing a Form I-20 differ from those for recommending a student for OPT. (*See id.* at 70:6-11).

The admissible evidence of record also makes clear that Dessoye did not submit a new OPT recommendation for Dalgic in December 2013. While Dessoye did testify early in her deposition that she recommended Dalgic for OPT on three occasions, July 2013, December 2013, and January 2014, (*see* Dessoye Dep., 54:23-55:2), Dessoye subsequently clarified that she reprinted the Form I-20 in December 2013, but "didn't know if it was a brand new recommendation[.]" (*Id.* at 55:20-22). Dessoye also testified that her belief that she recommended Dalgic for OPT in December 2013 was based on the fact that she reprinted the Form I-20 at that time. (*See id.* at 104:1-5). But Dessoye confirmed that she had no independent recollection of recommending Dalgic for OPT in December 2013, and she also agreed at her deposition that she "do[es] not know if [she] recommended Mr. Dalgic for OPT in December of 2013[.]" (*Id.* at 106:18-22). Thus, Dessoye's testimony does not support a finding that she recommended Dalgic for OPT in December 2013; she simply does not recall whether she did or did not. (*See* Dessoye Dep., 104:1-21).

---

[16] As explained in the text, even if Officer Wade's email is considered in resolving the motions before me, Dalgic would still be entitled to summary judgment as to liability.

Other documents of record, however, reflect that Dessoye recommended Dalgic for OPT a second time, but this was not until January 2014. For example, on March 21, 2014, Dessoye authored a letter to USCIS stating, in pertinent part, that "[o]n 01/22/2014, a second OPT request was submitted. (Pl.'s SMF, Ex. "3"). Dessoye included a copy of that letter indicating that her second OPT recommendation for Dalgic was submitted on January 22, 2014 in a fax to USCIS on April 1, 2014. (*See* Pl.'s SMF, Ex. "7").

Given the admissible record evidence, there is nothing to support a finding that Dessoye entered a recommendation for Dalgic to participate in OPT into his SEVIS record in December 2013. Instead, at issue is whether the reprinting of a Form I-20 changes the original OPT requested date or revalidates a prior OPT recommendation, *i.e.*, whether Dessoye's reprinting of the Form I-20 restarted the 30 day window for Dalgic to submit his Form I-765.

Turning to the text of the 8 C.F.R. § 214.2(f)(11)(i), reprinting a Form I-20 is not the same as recommending a student for post-completion OPT and it does not reset the 30 day clock for a student to submit his or her Form I-765. Section 214.2(f)(11)(i)(B)(2) states: "[t]he student must also file his or her Form I-765 or successor form with USCIS within 30 days of the date the DSO enters the recommendation for OPT into his or her SEVIS record." 8 C.F.R. § 214.2(f)(11)(i)(B)(2). That text is clear: the student's 30 day window to submit his OPT application begins only after the DSO "enters the recommendation for OPT" into the SEVIS record. *Id*. That is buttressed by § 214.2(f)(11)(ii)(B), which provides that "[t]he DSO must update the student's SEVIS record with the DSO's recommendation for OPT before the student can apply to USCIS for employment authorization. The DSO will indicate in SEVIS whether the employment is to be full-time or part-time, and note in SEVIS the start and end date of employment." *Id*. at § 214.2(f)(11)(ii)(B). These two provisions read together show that, for purposes of post-completion OPT, it is the update of the student's SEVIS record with the entry of the DSO's

recommendation for OPT that commences the 30 day window for a student to submit the Form I-765.

Other provisions of § 214.2 support the conclusion that it is the entry of the OPT recommendation in the student's SEVIS account, not the printing or reprinting of the Form I-20 or the updating of a student's SEVIS record, that is the controlling date with respect to the OPT application process. For example, a student under subsection (f) at a SEVIS school may participate in curricular practical training. *See* 8 C.F.R. § 214.2(f)(10)(i)(B). Under that section, the DSO will "update the student's record in SEVIS as being authorized for curricular practical training that is directly related to the student's major area of study. The DSO will indicate whether the training is full-time or part-time, the employer and location, and the employment start and end date." *Id*. The DSO must then "print a copy of the employment page of the SEVIS Form I-20 indicating that curricular practical training has been approved. The DSO must sign, date, and return the SEVIS Form I-20 to the student prior to the student's commencement of employment." *Id*. This provision is unlike § 214.2(f)(11)(i)(B)(2), where a DSO must do more than print the Form I-20, he or she must enter the OPT recommendation into the student's SEVIS record.

These provisions reflect that printing (or reprinting) a Form I-20 is not the same as entering a recommendation for OPT in a student's SEVIS record. And, for post-completion OPT application process purposes, a student must submit his or her Form I-765 within 30 days from the date the DSO enters the recommendation for OPT into the student's SEVIS record.

While scarce, this finding has support in the available authority discussing the 30 day requirement set forth in 8 C.F.R. § 214.2(f)(11)(i)(B)(2). Of note, USCIS has previously emphasized that "one should not confuse the date when the DSO recommends OPT in SEVIS by updating the student's SEVIS record with the date when the I-20 is issued or signed -- they are not the same but rather two separate events." 90 No. 40 Interpreter Release 2073 (Oct. 21, 2013). According to USCIS,

"[i]t is the 'OPT Employment Requested' date in the 'Event History,' not the date when the I-20 was issued or signed, that begins the 30-day filing clock specified in 8 CFR § 214.2(f)(11)(i)(B)(2). *Reprinting the I-20 will not change the OPT employment requested date*." *Id*. (emphasis added); *see also USCIS California Service Center: Academic Community Engagement* (Sept. 27, 2013), https://www.uscis.gov/archive/archive-outreach/archived-notes-previous-engagem ents/uscis-california-service-center-academic-community-engagement (follow Form I-765 Optional Practical Training Overview hyperlink). This position is consistent with that expressed by the National Association of Foreign Student Advisors, which is of the view that "[i]t is the OPT Employment Requested date in the Event History that begins the 30-day filing deadline specified in 8 C.F.R. § 214.2(f)(11)(i)(B)(2)" and that "[r]eissuing the I-20 will not change the OPT Employment requested date." *Managing the 30-Day Post-Completion OPT Filing Deadline*, NAFSA Practice Advisory (Oct. 23, 2012), https://www.nafsa.org/Professional_Resources/Browse_by_ Interest/International_Students_and_Scholars/Network_Resources/International_St udent_and_Scholar_Services/NAFSA_Practice_Advisory__Managing_the_30-Day _Post-Completion_OPT_Filing_Deadline/.

Given the text of 8 C.F.R. § 214.2(f)(11)(ii)(B), the authority cited above, and the admissible record evidence, Dessoye's reprinting of the Form I-20 in December 2013 did not change her OPT employment recommendation date, which was entered into Dalgi's SEVIS record on July 24, 2013, nor did it restart the 30 day period for Dalgic to submit his Form I-765. The impact of this finding on Dalgic's claims and the parties' cross-motions for summary judgment is addressed below.

But first, I pause to note that even if Officer Wade's July 31, 2014 email was admissible and considered in the present context, it would still not create a genuine factual dispute regarding the date Dessoye recommended Dalgic for OPT, nor would it support Misericordia's position regarding the controlling date that Dessoye recommended Dalgic for OPT. Turning back to his email, Officer Wade stated that

Dessoye first recommended Dalgic for OPT on July 24, 2013. (*See* Def.'s SMF, Dessoye Affidavit, attachment). Officer Wade further observed that "a second request for OPT was entered in this applicant's SEVIS record on January 22, 2014." (*Id.*). Officer Wade's email is clear: two, and only two, OPT recommendations were entered into Dalgic's SEVIS record, the July 24, 2013 recommendation and the January 22, 2014 recommendation. Officer Wade also mentioned that Daglic's Form I-20 was reprinted on December 4, 2013 and was submitted as supporting evidence with Dalgic's Form I-765. However, Officer Wade indicated that "[t]he DSO recommendation for OPT," *i.e.*, the July 24, 2013 recommendation, "was entered more than 30 days prior to the filing of the Form I-765" on January 9, 2014. (*Id.*). Officer Wade went on to observe that "[i]n addition," based on the reprinted December 4, 2013 Form I-20 in Dalgic's application materials, "the intent to recommend this applicant for employment authorization based on OPT [was] noted," but "more than 30 days had elapsed from the re-printing of the Form I-20 and the filing date of the Form I-765." (*Id.*).

These passages do not establish that Dessoye's reprinting of the Form I-20 constituted a new OPT recommendation, nor does it reflect that it restarted the 30 day window for Dalgic to submit his OPT application for at least two reasons. For one, and quite obviously, an intent to recommend is decidedly different than an actual recommendation. Officer Wade says only that the Form I-20 was reprinted in December 4, 2013, which reflected an "intent to recommend." What he does not say, however, is that Dessoye entered the recommendation into Dalgic's SEVIS record at that time. As discussed above, the text of § 214.2(f)(11)(ii)(B) makes certain that it is the entry of the OPT recommendation into the student's SEVIS record which triggers the 30 day period for the student to submit his Form I-765 with USCIS. Accordingly, irrespective of whether Dessoye may have intended to recommend Dalgic for OPT in December 2013, there are no record facts showing that Dessoye actually entered an OPT recommendation into Dalgic's SEVIS in December 2013.

Second, and as also explained previously, reprinting a Form I-20 is not the same as a DSO entering a recommendation for OPT in a student's SEVIS record.

Further, in his conclusion of his file review, Officer Wade reiterates that "the applicant filed the Form I-765 with USCIS more than 30 days following the DSO recommendation for OPT in the SEVIS record." (*Id.*). This language is largely identical to that Officer Wade used when referring to the July 24, 2013 OPT recommendation. (*See id.* ("the DSO recommendation for OPT was entered in the applicant's record on July 24, 2013.")). Thus, even if this document was admissible hearsay, Officer Wade's email is consistent with the record evidence that Dessoye prematurely recommended Dalgic for OPT in July 2013, and she did not recommend him for OPT again until January 2014, which was after Dalgic submitted his Form I-765. In short, Officer Wade's email, while inadmissible, still does not support Misericordia's position that Dessoye recommended Dalgic for OPT in December 2013, nor does it show that Dessoye's actions at that time satisfied the requirements set forth in the federal regulations for recommending a student for OPT.

With that settled, I turn to the parties' cross-motions for summary judgment.

## C.     The Cross-Motions for Summary Judgment.

Dalgic is proceeding against Misericordia on two causes of action: (1) negligence; and (2) negligent interference with prospective contractual relations. (*See* Doc. 24, *generally*). "The elements of negligence under Pennsylvania law are: (1) 'a legally recognized duty or obligation of the defendant,' (2) 'the breach thereof,' and (3) a 'causal connection' between the breach and the plaintiffs' damages." *Shuker v. Smith & Nephew, PCL*, 885 F.3d 760, 776 (3d Cir. 2018) (quoting *Green v. Pa. Hosp.*, 123 A.3d 310, 315-16 (Pa. 2015)). As to the negligent interference with prospective contractual relations claim, the parties dispute the elements required to establish such

a cause of action. (*Compare* Doc. 52, 5, *and* 65, 12-13, *with* Doc. 60, 11-13).[17] I previously stated in this litigation that "'Pennsylvania courts generally do not recognize a cause of action for 'negligent interference with a contract' but "'[a] limited exception to this bar is where a special relationship exists among the parties.'" (Doc. 31, 5 (citations omitted)).[18]

Here, Misericordia contends that it is entitled to summary judgment in its entirety on both of Dalgic's claims, while Dalgic requests that summary judgment be granted in his favor as to liability. I will address Misericordia's motion first.

### 1. Misericordia's Summary Judgment Motion.

Misericordia advances three reasons in support of its motion for summary judgment. (*See* Doc. 53, *generally*). First, Misericordia asserts that it was not the proximate cause of the denial of Dalgic's OPT application. Second, Misericordia argues there did not exist a special relationship between itself and Dalgic, so he is not able to recover on a negligent interference with prospective contractual relations claim. Third, Misericordia contends that Dalgic's claims are barred by the applicable

---

[17]  *See*, *e.g.*, *UMG Recordings, Inc. v. Global Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092, 1118 (C.D. Cal. 2015) (under California law, the elements of negligent interference with prospective economic advantage claim are "(1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the defendant was negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship.").

[18]  Such a special relationship, says Dalgic, is no longer required to maintain a negligent interference claim in light of the Pennsylvania Supreme Court's decision in *Dittman v. UPMC*, 196 A.3d 1036 (Pa. 2018). I address this contention in the text below.

two year statute of limitations.

### a.   Proximate Cause.

"To establish a *prima facie* case of negligence, a plaintiff must produce sufficient facts to show that the defendant's negligence was both the cause-in-fact and the legal, or proximate, cause of her injuries.  In Pennsylvania, a negligent act is a cause-in-fact of the plaintiff's injuries 'if the harmful result would not have come about but for the negligent conduct.'" *Straw v. Fair*, 187 A.3d 966, 993 (Pa. Super. Ct. 2018) (quoting *First v. Zem Zem Temple*, 686 A.2d 18, 21 n.2 (Pa. Super. Ct. 1996)).  "[C]onduct is a proximate cause of the plaintiff's harm where the conduct 'was a substantial factor in bringing about the harm inflicted upon a plaintiff.'" *Id*. (quoting *Jones v. Montefiore Hosp.*, 431 A.2d 920, 923 (Pa. 1981)).  "Under Pennsylvania law, a 'judge may determine that no jury could reasonably differ as to whether the plaintiff has sufficiently established a causal link.  In such cases, our trial courts are charged with performing their standard gatekeeping function in determining which cases should be permitted to be argued to a jury.'" *Heeter v. Honeywell Int'l Inc.*, 706 F. App'x 63, 66 (3d Cir. 2017) (quoting *Toney v. Chester Cty. Hosp.*, 36 A.3d 83, 99 (Pa. 2011)); *see also* Straw, 187 A.3d at 994 ("If issues are raised on which a jury may not reasonably differ, it is proper for the trial court to decide them.  If, on the other hand, a jury may reasonably differ on whether the defendant's conduct was a substantial factor in causing the injury, generally, the case must go to the jury on those issues.").

Misericordia contends that it is entitled to summary judgment on both of Dalgic's claims because the undisputed evidence of record demonstrates that he caused his own injuries by failing to file his Form I-765 within 30 day of Dessoye's actions related to the Form I-20 on December 4, 2013.  Misericordia's position as to proximate cause is based on two similar, but slightly different points.  One is that the reprinting of the Form I-20 in December 2013 was a recommendation for OPT.  And two, that a reprinted Form I-20, even if not a recommendation for OPT, restarts the 30 day period for which a student must submit his or her OPT application.  Based on

these points, Misericordia is of the view that because Dalgic submitted his OPT application more than 30 days after the Form I-20 was reprinted, his negligence caused his own injuries. Neither of these points have merit, so summary judgment in Misericordia's favor is not warranted as to causation.

The governing regulations and the facts of record confirm that Dalgic's OPT application was denied because Dessoye prematurely recommended him for OPT in July 2013. As a result of this premature recommendation which was entered into Dalgic's SEVIS record more than 120 days before he graduated, it was not possible for Dalgic to comply with the deadlines set forth in 8 C.F.R. § 214.2(f)(11)(i)(B)(2). As detailed, it is the entry of the recommendation for OPT into the student's SEVIS record that triggers the start of the 30 day window for the student to submit his or her OPT application, and the reprinting of a Form I-20 does not alter the OPT employment requested date. Thus, although Dalgic submitted his Form I-765 more than 30 days after his Form I-20 was reprinted by Dessoye on December 4, 2013, this had no impact on the denial of his OPT application because Dalgic was unable to meet the timelines under § 214.2(f)(11)(i)(B)(2) given Dessoye's premature recommendation.[19] Misericordia is not entitled to summary judgment as to causation. Rather, as explained below, the undisputed material facts reflect that Misericordia's negligence caused the denial of the OPT application, so Dalgic is entitled to summary judgment on this point.

---

[19]     In that regard, I recognize the parties' disagreement as to whether Dessoye provided Dalgic outdated OPT application instructions in December 2013, and, as a corollary, they dispute which party was responsible for the inclusion of the incorrect filing fee which resulted in the return of Dalgic's OPT application in late December 2013. This dispute does not impact the outcome of the parties' cross-motions. Dessoye entered her recommendation for OPT on July 24, 2013. Regardless of whether Dalgic applied for OPT in December 2013 or January 2014, his application still would not have been timely under the regulations because of Dessoye's premature entry of the OPT recommendation in July 2013. Thus, whether or not Dessoye provided current or outdated instructions to Dalgic in December 2013 and/or which party was responsible for submitting the incorrect filing fee is of no moment.

### b.    Negligent Interference.

Next, Misericordia argues that it is entitled to summary judgment on the negligent interference with prospective economic relationship claim because it did not have a special relationship with Dalgic.  Dalgic, in opposition, contends that: (1) it need not establish a special relationship to prevail on a negligent interference claim in light of *Dittman v. UPMC*, 196 A.3d 1036 (Pa. 2018); and (2) irrespective of *Dittman*, the facts of record establish beyond dispute that such a relationship existed between the parties.

In *Dittman*, a class of employees claimed, *inter alia*, that its employer was negligent when it failed to safeguard their sensitive personal information stored on the employer's internet-accessible computer system.  *See Dittman*, 196 A.3d at 1038. On appeal, one issue addressed by the Pennsylvania Supreme Court was "the scope of Pennsylvania's economic loss doctrine, specifically whether it permits recovery in negligence for purely pecuniary damages." *Id*. at 1038.  Reviewing its prior decisions, the *Dittman* court held that Pennsylvania Supreme Court precedent did not "stand for the proposition that the economic loss doctrine, as applied in Pennsylvania, precludes all negligence claims seeking solely economic damages."  *Id*. at 1054.  Rather, the court reiterated that "'Pennsylvania has long recognized that purely economic losses are recoverable in a variety of tort actions' and that 'a plaintiff is not barred from recovering economic losses simply because the action sounds in tort rather than contract law.'" *Id*. (quoting *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 288 (Pa. 2005)).  In so doing, the *Dittman* court addressed the Superior Court's decision in *Aikens v. Baltimore & Ohio R.R. Co.*, 501 A.2d 277, 278-79 (Pa. Super. Ct. 1985), which "adopted Section 776C of the Restatement (Second) of Torts, which bars recovery of purely economic damages for negligent interference with a contract or prospective contractual relation, and concluded that recovery is only possible if the tortious interference is intentional or involved parties in a special relationship to one another." *Dittman*, 196 A.3d at 1055 n.22 (citing *Aikens*, 501 A.2d

at 278-79).[20]  While observing that the *Aikens* court broadly stated that "no cause of action exists for negligence that causes only economic loss," the Supreme Court in *Dittman* explained that "closer examination" revealed that the Superior Court's observation was made in reference to the plaintiffs' attempt to recover in negligence arising out of their relationship with their employer that the tortfeasor was unaware. *Dittman*, 196 A.3d at 1055 n.22.  Thus, *Dittman* rejected the "general pronouncement" that "all negligence claims for economic losses are barred under Pennsylvania law." *Id*.  Rather, the Supreme Court held that "under Pennsylvania's economic loss doctrine, recovery for purely pecuniary damages is permissible under a negligence theory provided that the plaintiff can establish the defendant's breach of a legal duty arising under common law that is independent of any duty assumed pursuant to contract." *Id*. at 1038.

The parties dispute whether *Dittman* alters the analysis of Dalgic's negligent interference with prospective contractual relations claim.  To Misericordia, it does not, and it correctly notes that *Dittman* did not involve a claim for negligent interference with prospective economic advantage.  (*See* Doc. 66, 12-14).  Dalgic argues in opposition, however, that the *Dittman* court expressly rejected *Aikens* to the "extent the case was understood to stand for the proposition that negligent interference claims are actionable only if the plaintiff and the defendant were in a special relationship." (Doc. 58, 18-19).

---

[20]     The Superior Court in *Aikens* stated: "recovery for purely economic loss occasioned by tortious interference with contract or economic advantage is not available under a negligence theory. . . . A cause of action exists in this situation only if the tortious interference was intentional or involved parties in a special relationship to one another. . . . Therefore, negligent harm to economic advantage alone is too remote for recovery under a negligence theory.  The reason a plaintiff cannot recover stems from the fact that the negligent actor has no knowledge of the contract or prospective relation and thus has no reason to foresee any harm to the plaintiff's interest." *Aikens*, 501 A.2d at 278-79 (internal citations omitted).

While Dalgic appears to have the better of the argument,[21] I need not resolve this dispute regarding the proper reading of *Dittman*. Assuming a special relationship is still required to sustain a negligent interference with prospective contractual relations claim under Pennsylvania law, as argued by Misericordia, it is still not entitled to summary judgment on this claim. To the contrary, on the facts of this case, a special relationship existed between Dalgic and Misericordia.

A "'special relationship' is one involving confidentiality, the repose of special trust, or fiduciary responsibility." *Volunteer Firemen's Ins. Servs., Inc. v. Fuller*, No. 12-2016, 2012 WL 6681802, at *9 (M.D. Pa. Dec. 21, 2012) (quoting *Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.*, 28 F. Supp. 2d 947, 952 (E.D. Pa. 1998)); *see also L&M Beverage Co. v. Guinness Import Co.*, No. 94-4492, 1995 WL 771113, at *5 (E.D. Pa. Dec. 29, 1995) ("Special relationship has been defined as a confidential or fiduciary relationship where one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence or justifiable trust, on the other."). In denying Misericordia's motion for judgment on the pleadings, I observed that Pennsylvania law was unclear regarding the existence of a fiduciary duty between a university and its students, but I found at that stage of the litigation that it would be premature to determine whether a special relationship existed between the parties. (*See* Doc. 31, 6 (citing *Gjeka v. Del. Cnty.*

---

[21]    To be sure, *Dittman* was not a negligent interference case. Nonetheless, its analysis of the economic loss doctrine and the nonbinding decisions it discusses suggests that the Pennsylvania Supreme Court views foreseeability, not the relationship of the tortfeasor and the plaintiff, as the core consideration to the viability of such a cause of action. This is indicated by *Dittman*'s observation that the Superior Court in *Aikens* exhibited "a clear concern with foreseeability and limitation of liability" as the *Aikens* court's conclusion was supported by reasoning that "the negligent actor has no knowledge of the contract or prospective relation and thus has no reason to foresee any harm to the plaintiff's interest." *Dittman*, 196 A.3d at 1055 n.22.

*Cmty. Coll.*, No. 12-4548, 2013 WL 2257727, at \*10-11 (E.D. Pa. May 23, 2013) (noting that Pennsylvania law is unclear on the existence of a fiduciary relationship between universities/professors and their students); *Fay v. Thiel College*, 55 Pa. D. & C. 4th 353, 362-63 (Pa. C.P. Mercer Cnty. 2001) ("Although it is true that a college does not owe its students an *in loco parentis* duty simply because of the college/student relationship, it is also true that a college can owe a particular student a special duty as a result of a special relationship that exists between the college and that particular student."))).

On the present motion, the record evidence and the applicable regulations confirm the existence of a special relationship between Misericordia and Dalgic. In particular, Dalgic justifiably trusted Misericordia and Dessoye to guide him through the process of studying in the United States and, in particular, applying to OPT. Dessoye testified that one of the roles and responsibilities of a DSO is to instruct a student to file the required documentation with the proper filing fee when applying for OPT. (*See* Dessoye Dep., 83:10-17). She also indicated that she provided at least some of the instructions to Dalgic which he would need to complete his OPT application. (*See id*. at 145:23-147:23). Dalgic likewise testified that Dessoye provided him with the paperwork he needed to complete to apply for OPT. (*See* Dalgic Dep., 103:2-6). Dessoye also acknowledged that a DSO recommendation is required for a student applying for OPT. (*See* Dessoye Dep. 113:18-22, Ex. "12").

This is consistent with the obligations imposed on Misericordia under federal law. Specifically, Misericordia was obligated to have a DSO. *See* 8 C.F.R. § 214.3(l). The DSO is responsible for "assisting and overseeing enrolled M and F students." https://studyinthestates.dhs.gov/designated-school-official (last visited April 1, 2019). DSOs are required by federal law to update and maintain student records in SEVIS. *See id*. A DSO also "helps international students avoid problems by helping them do things through required processes." *Id*. Among these things are updating student records, providing advice, and helping "fill out important forms."

https://studyinthestates.dhs.gov/2014/04/students-what-is-a-dso (last visited April 1, 2019). DHS characterizes a DSO as the "biggest resource" for an F or M student, responsible for answering student questions and guiding the student through the process of studying in the United States. *See id.* A DSO "must also understand" applicable "regulations and policy guidance," including "8 Code of Federal Regulations (CFR) 214.2(f)(10) through (13)." https://studyinthestates.dhs.gov/sevis-help-hub/student-records/fm-student-employment/f-1-optional-practical-training-opt (last visited April 5, 2019).

Given the facts of record and applicable federal regulations, a special relationship existed between Dalgic and Misericordia. Misericordia is therefore not entitled to summary judgment on the negligent interference claim.

### c.     Statute of Limitations.

Lastly, Misericordia argues that it should be granted summary judgment because Dalgic failed to timely commence this litgiation. The statute of limitations on a negligence claim under Pennsylvania law is two (2) years. *See* 42 Pa. C.S.A. § 5524.

According to Misericordia, the statute of limitations on Dalgic's claims began to run on either July 24, 2013 when Dessoye prematurely recommended him for OPT or on December 4, 2013 when she reprinted his Form I-20. Either way, argues Misericordia, these events occurred more than two years before this action was filed on March 11, 2016, so it concludes that Dalgic's claims are time-barred.

In opposition, Dalgic disputes that his claims were untimely filed because the injury at issue, the denial of his OPT application, occurred on March 18, 2014, the date USCIS issued its denial letter. As his original complaint in this action was filed within two years of that date, Dalgic contends that this action was commenced within the applicable limitations period. Dalgic is correct.

"Generally, a statute of limitations period begins to run when a cause of action accrues; *i.e.*, when an injury is inflicted and the corresponding right to institute a suit for damages arises." *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011)

(citing *Wilson v. El–Daief*, 964 A.2d 354, 361 (Pa. 2009)); *see also Vitale v. Buckingham Mfg. Co., Inc.*, 184 Fed.Appx. 156, 158 (3d Cir. 2006) ("Pennsylvania's two-year statute of limitations for an injury caused by the wrongful act or negligence of another generally begins to run as soon as the injury is inflicted."). "'In most cases, the statute of limitations begins to run on the date the injury is sustained. Once the prescribed statutory period has expired, a plaintiff is thereafter barred from commencing suit.'" *Haines v. Jones*, 830 A.2d 579, 585 (Pa. Super. Ct. 2003) (quoting *Bradley v. Ragheb*, 633 A.2d 192, 194 (Pa. Super. Ct. 1993)).

The injury at issue here was the denial of Dalgic's OPT application, which occurred on March 18, 2014, the date USCIS issued its denial letter. That is so because, quite plainly, Dalgic could not maintain a negligence claim against Misericordia for the handling of his OPT application until his application was actually denied. "Pursuant to Pennsylvania law, a cause of action accrues when a plaintiff could first maintain the action to successful conclusion." *Osborne v. Lewis*, 59 A.3d 1109, 1114 (Pa. Super. Ct. 2012) (citation omitted). In other words, "a right of action accrues only when injury is sustained by the plaintiff, - not when the causes are set in motion which ultimately produce injury as a consequence.*" Ayers v. Morgan*, 154 A.2d 788, 790 (Pa. 1959) (citation and quotation omitted). Here, Dalgic's cause of action accrued on March 18, 2014 when his OPT application was denied. His claims are not barred by the statute of limitations.

Misericordia is not entitled to summary judgment. Its motion will be denied in its entirety.

### 2. Dalgic's Summary Judgment Motion.

Dalgic has also moved for summary judgment on the ground that no genuine issues of fact exist as to Misericordia's liability. Specifically, Dalgic contends that liability on both of his claims has been established because: (1) he had a prospective economic relationship following his graduation from OPT and Misericordia was aware of that future relationship; (2), Misericordia acted negligently in handling his OPT

application; and (3) Misericordia caused his harm. (*See* Doc. 52, 5-14). The "key issue", says Misericordia in opposition, "is proximate causation for the denial of Dalgic's [OPT] Application." (Doc. 60, 1). On this point, and like it argued in its cross-motion, Misericordia emphasizes that it was Dalgic's own conduct that was the proximate cause of the denial of his OPT application. (*See id*. at 5-11). Additionally, Misericordia maintains that the lack of a special relationship between it and Dalgic is fatal to his negligent interference claim. (*See id*. at 1, 11-13).

Dalgic's motion for partial summary judgment will be granted. Misericordia does not dispute that Dalgic had a prospective contract for post-OPT employment and/or that it had knowledge of same. (*See* Doc. 60, *generally*). Misericordia thus waived its opportunity to contest these points. *See*, *e .g.*, *Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003). The record also demonstrates the absence of a genuine factual dispute as to Dalgic's prospective economic relationship, *i.e.*, post-completion OPT employment, and Misericordia's awareness of that fact. (*See* Dessoye Dep., 158:3-22; Pl.'s SMF, ¶¶ 49, 51, 53; Def.'s CSF, ¶¶ 49, 51, 53)

Nor does Misericordia dispute that it acted negligently in handling Dalgic's OPT application. As detailed above, as a certified-SEVP institution, Misericordia was responsible for complying with certain federal regulations. Among other requirements, a SEVP institution must have a DSO that is to assist and oversee F students, such as Dalgic. This includes helping students navigate the required processes, such as the OPT application process. (*See* Dessoye Dep., 77:8-17). Yet despite being obligated to do so, Misericordia failed to meet this duty, as its DSO was not aware of certain essential aspects of the OPT application process. Indeed, Misericordia concedes as much in acknowledging that Dessoye prematurely recommended Dalgic for OPT in July 2013. (*See* Doc. 60, 1 (admitting that the July 2013 recommendation was premature); *see id*. at 5 (noting that an admittedly negligent act does not establish liability in the absence of that conduct being the proximate cause of the injury sustained)). Dessoye also testified that despite being Misericordia's

DSO, she was not aware of the governing regulation requiring that a Form I-765 be submitted within 30 days of the entry of the OPT recommendation. (Dessoye Dep., 88:15-90:14).[22] Thus, there is no factual dispute that Misericordia was negligent with respect to the premature recommendation of Dalgic for OPT in July 2013 which rendered it impossible for him to comply with the OPT application deadlines set forth in the federal regulations.

Instead, Misericordia's summary judgment opposition focuses on causation, the standard for which is laid out above. Relying on its expert report and the email from Officer Wade, Misericordia insists that the denial of the OPT application was proximately caused by Dalgic's own conduct. (*See* Doc. 60, 5-11). This is so, it says, because Dessoye updated her recommendation in December 2013 when she reprinted Dalgic's Form I-20, which "validated her prior recommendation" and "therefore restarted the thirty (30) day period for filing the Form I-765." (*Id*. at 6).

Misericordia is not correct, and I have rejected these arguments earlier in this Opinion. The evidence it relies on is not admissible, the Officer Wade email even if it was admissible is consistent with the record evidence that Dessoye did *not* recommend Dalgic for OPT in December 2013, and reprinting a Form I-20 does not restart the 30 day window for which a student has to file his or her Form I-765 under 8 C.F.R. § 214.2(f)(11)(i)(B)(2).

Dalgic, conversely, has demonstrated the absence of a genuine issue of fact as to the cause of the denial of the OPT application. Restated, Dalgic has demonstrated

---

[22]    The parties argue whether or not Dalgic requested Dessoye recommend him for OPT in July 2013. (*See* Def.'s SMF, ¶ 7; Pl.'s CSF, ¶ 7). This does not preclude the entry of summary judgment in Dalgic's favor. Misericordia does not appear to contest that it was required to be knowledgeable about the applicable regulations pertaining to F-1 students, which includes those governing OPT, nor could it. Thus, even if Dalgic prematurely requested a recommendation for OPT, Misericordia had a duty to be versed and knowledgeable on the correct procedures and deadlines to ensure it timely entered the OPT recommendation.

that Misericordia was the cause-in-fact and proximate cause of his injuries.

All of the admissible record evidence confirms that Dessoye recommended Dalgic for OPT twice: once in July 2013 and not again until January 22, 2014. Because Dessoye's OPT recommendation in July 2013 was entered more than 120 days before Dalgic's graduation date, it was not possible for him to comply with the OPT application deadlines. Thus, without the premature OPT recommendation, Dalgic's OPT application would not have been denied. Misericordia was both the cause-in-fact and proximate cause of Dalgic's injuries. While Misericordia does point to Dessoye's deposition testimony that she believed she recommended Dalgic for OPT in December 2013, she subsequently clarified that she "did not know" if she submitted such a recommendation at that time. (Dessoye Dep., 106:18-22; *see also id.* at 104:1-9 (answering "Yeah" to the question "So, again, the reason that you believe that you recommended Mr. Dalgic for OPT in December of 2013 is because you printed an I-20, correct?" and "Definitively, no" when asked if she had "an independent recollection of making a recommendation in December of 2013 of Mr. Dalgic for OPT?")). This is precisely the sort of "metaphysical doubt" that is not sufficient to defeat summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts").

Accordingly, finding that Dalgic has shown that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law, his motion for summary judgment as to liability on his negligence claim will be granted.

Dalgic will also be granted summary judgment as to liability on his negligent interference with prospective economic relationship claim. With respect to this claim, Misericordia contests that it was the proximate cause of the denial of Dalgic's OPT application or that the parties were in a special relationship. But, as discussed immediately above, Dalgic has shown that there is no genuine issue of material fact

as to causation.  Furthermore, assuming that Dalgic's negligent interference claim requires proof of a "special relationship", the undisputed facts of record demonstrate the existence of such a relationship for the reasons detailed before.  On this claim as well, Dalgic is entitled to summary judgment as to liability.

## IV. Conclusion

For the above stated reasons, Misericordia's motion for summary judgment will be denied.  Dalgic's motion for partial summary judgment will be granted.  A jury trial will be held on Dalgic's damages.

An appropriate order follows.


July 3, 2019                                    /s/ A. Richard Caputo
Date                                            A. Richard Caputo
                                                United States District Judge